A. R. BARNES & CO. et al. v. BERRY et al.

(Circuit Court, S. D. Ohio, W. D. October 21, 1907.)

No. 6,295.

1. COURTS—FEDERAL COURTS—JURISDICTION—DIVERSE CITIZENSHIP.

Where a bill for an injunction in the federal court was sustainable only on the ground of diverse citizenship, and it failed to show that all the parties on one side of the controversy were entitled because of diverse citizenship to sue all the parties on the other side, it did not present a case of federal jurisdiction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 855.]

2. SAME—DISPENSABLE PARTIES—DISMISSAL.

Where a bill maintainable in the federal court only because of diverse citizenship did not show that all the parties on one side of the controversy were entitled by diverse citizenship to sue all the parties on the other side, but could be made sustainable if certain defendants of the same citizenship as some of the complainants were dismissed, and it did not appear that they were necessary parties, they not having entered their

appearance, the court was authorized by equity rule 47 to dismiss the case as to them.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 863.]

**3. PARTIES—REPRESENTATION.**

Where a voluntary association of business concerns engaged in printing, known as the "Typothetæ," executed a contract with the representatives of the International Printing Pressmen and Assistants' Union, also a voluntary association, a suit to enforce such contract might be maintained, as provided by equity rule 48, by a few of the members of the Typothetæ in behalf of all the others against the executive officers of the union, or such members as fairly represented its interests.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Parties, §§ 12, 30.]

**4. MONOPOLIES—LABOR CONDITIONS—"CLOSED SHOP."**

A demand by laborers for a "closed shop," or that no person, not a member of their union, should be employed therein, was contrary to public policy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, § 10.]

**5. INJUNCTION—STRIKES.**

Where the service of members of a trade union was neither special, extraordinary, nor unique, in the sense that it could not otherwise be supplied, and that its loss would cause irreparable injury, an injunction could not be granted to restrain the individual laborers from striking.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 117, 118.]

**6. SAME—CONTRACT WITH TRADE UNIONS—ENFORCEMENT.**

The officers of the International Printing Pressmen and Assistants' Union. desiring to obtain a closed shop and an eight-hour day, presented to the Typothetæ of America, a voluntary association of employing printers. a contract to this effect, which was rejected, and on January 8, 1907, a contract between the parties was ratified, which was a mere renewal of a previous contract and did not provide for a closed shop, but declared that within a reasonable time, to wit, after January 1, 1909, an eight-hour day should be granted. This contract, having been affirmed by both parties, was carried out for but a short time, when, owing to a change of officers of the union, a demand was made that the contract be modified so as to provide for an immediate eight-hour day and a closed shop. and to enforce this demand, which was denied, the officers incited the members of their various local unions to strike against their employers, who were various members of the Typothetæ. *Held*, to justify an injunction restraining the officers of the union from demanding a modification of the existing contract. from calling, instituting, or inciting strikes because of the refusal of the members of the Typothetæ to institute an eight-hour day and a closed shop, from arranging for a referendum vote of the employés on the subject of instituting strikes, and from paying strike benefits.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 117, 118.]

On Motion for an Injunction.

Charles B. Wilby, Henry Spalding, and Dudley Taylor, for complainants.

Kinkead, Rogers & Ellis, for defendants.

THOMPSON, District Judge (orally). This suit is brought to prevent the violation of a contract between two voluntary associations, the United Typothetæ of America and the International Printing Pressmen and Assistants' Union of North America. The complainants are

members and officers of the Typothetæ, suing "in their own behalf and as representatives of and in behalf of all other members" of the Typothetæ, against Berry, the president, William L. Murphy, John G. Warrington, and Peter J. Breen, the vice presidents, and Patrick J. McMullen, secretary and treasurer of the union, "and all other officers and agents" of the Union, "and of the local and subordinate branches and unions thereof." The members and officers of the Typothetæ, named, are citizens of states other than Ohio, and the president and the secretary and treasurer of the Union are citizens of Ohio, and the vice presidents are citizens of Montana, Missouri, and New York; but it is not shown by the bill who the other members, officers, and agents of the Union are, or of what state or states they are citizens. It is shown, however, that the complainants Theodore L. De Vinne & Co., Publishers' Printing Company, I. H. Blanchard & Co., William Green, and John Macintyre are citizens of New York, and that the complainant the Franklin Hudson Publishing Company is a citizen of Missouri. The bill therefore fails to show that all the parties on one side of the controversy have a right by diverse citizenship to sue all the parties on the other side, and thereby fails to bring the controversy within the jurisdiction of the court. But the complainants now move the court to dismiss the defendants Murphy, Warrington, and Green, upon the ground that they are not indispensable parties, and that it proceed in the cause without them, in conformity with the provisions of equity rules 47 and 48, and the question presented is whether these rules are applicable to this controversy.

In the opinion of the court these rules are applicable. The jurisdiction of the court depends upon the citizenship of the parties before the court, and not of those whom they may represent under rules 47 and 48. In Great Southern Fireproof Hotel Company v. Jones, 177 U. S. 449, 20 Sup. Ct. 690, 44 L. Ed. 482, the suit was brought by Benjamin F. Jones and George M. Laughlins, Henry A. Laughlins, Jr., and Benjamin F. Jones, Jr., as "members of a limited partnership association, doing business under the firm name and style of Jones & Laughlins, Limited, * * * which association is a citizen of the state of Pennsylvania." The citizenship of the members composing the partnership was not set forth in the bill. The court held that the partnership could not be a citizen, and that, as the citizenship of the partners was not shown, dismissed the bill, saying:

"We therefore adjudge that, as the bill does not make a case arising under the Constitution and laws of the United States, it was necessary to set out the citizenship of the individual members of the partnership association of Jones & Laughlins, Limited, which brought this suit."

Here the suit was not brought by the Typothetæ, but by a few of the members thereof, on behalf of themselves and the others, and their citizenship was set forth in the bill. The Typothetæ is composed of persons, partnerships, and corporations, and the Union of subordinate unions, and under rule 48 a few of the members of the Typothetæ may sue in behalf of all the others against such members of the Union as may fairly represent its interests. Its interests are fairly represented by its executive officers, the president and the secretary and treasurer,

and the only remaining question is whether, under rule 47, the three vice presidents, as parties, should be dismissed from the case. They are not within the jurisdiction of the court, they have not entered their appearance, they are not indispensable parties, and their voluntary appearance, if permitted, would oust the jurisdiction of the court, and the motion, therefore, to dismiss them from the case, will be sustained.

That brings us to the main question. The real parties in interest are the employers and the employés. They are the constituents of the two organizations. In their associated capacity they act through officers and agents selected by them. The contract in question was made by the constituent members of these associations, acting through their officers and agents. The employers now seek to enforce practically the specific performance of the contract by enjoining the officers and agents of the employés from: (1) Violating the contract by demanding a modification thereof whereby the "eight-hour day" and the "closed shop" may be instituted; (2) calling, instituting, or inciting strikes or otherwise hindering, interfering with, obstructing, or stopping the business of the employers because of their refusal to institute the "eight-hour day" and the "closed shop"; (3) arranging for a referendum vote of employés upon the subject of instituting strikes; (4) paying strike benefits.

The purpose of the contract or agreement is set forth in the first paragraph thereof, as follows:

"For the purpose of establishing between the employing printers of the United States and their pressmen and feeders uniform shop practices and fair scales of wages, settlement of all questions arising between them, and the abolition of strikes, sympathetic or otherwise, lockouts and boycotts."

It is charged in the bill that at a convention of the Union held at Pittsburg, in June, 1906, the board of directors of the Union were authorized and instructed to meet a committee of the Typothetæ and secure a renewal of the contract expiring May 1, 1907, which action of the directors should be final without ratification by the Union, and that the agreement of January 8, 1907 (Exhibit No. 2) so made by them is binding upon the Union and its constituents, without their ratification, although ratification thereof by the convention of the Typothetæ was necessary to make it effective. On the other hand, Berry, the president of the Union, by affidavit, sets forth a copy of the report of the "committee on officers' reports," based upon the recommendation by the president of the Union, and which was adopted by the convention, in which it is stated that:

"The committee are pleased to coincide with the recommendations of the board of directors, inasmuch as they are of such a nature that the committee have seen fit to indorse the plan of assessment as formulated by the board, and that we recommend that this convention declare in favor of the eight-hour day immediately after the expiration of the agreement now existing between the U. T. A. and the I. P. T. and A. U., provided it is not within the scope of possibilities of having same arranged amicably and equitably between the U. P. A. and I. P. T. and A. U., within a reasonable time after the expiration of the agreement now existing between these two respective organizations."

If there was a prospect that an arrangement could be made for the adoption of the "eight-hour day" within a reasonable time, they would

wait; otherwise, if there was no such reasonable prospect, then demand should be made for the immediate adoption of the "eight-hour day." The suggestion is that it was not the understanding of the parties that the time should be fixed as set forth in the agreement, but that a reasonable time was to be agreed upon, and that it was open for further consideration; that is, the suggestion conveyed by what I have just read, but in that connection I will read from the affidavit of Macintyre. He says:

"I have also examined 'The American Pressman' (volume 16, No. 10), issued at St. Louis, September, 1906, which purports to set forth the official proceedings of the 18th annual convention of the International Printing Pressmen and Assistants' Union, held at Pittsburgh, Pennsylvania, June 18–23, 1906. * * * I have also examined the same publication (volume 17, No. 10), issued September 20, 1907. * * * Said issue of September 20, 1907, of said publication, purports to cover the official proceedings of the 19th annual convention of the International Printing Pressmen and Assistants' Union of North America, held at Brighton Beach, N. Y., June 17–23, 1907. That on page 28 of said number there is set out under the heading 'Exhibit II' a form of agreement purporting to be an agreement between the said Union and said Typothetæ, which said agreement contained a provision for an eight-hour day beginning July 1, 1908. That at the end of said Exhibit II, on page 29 of said publication, the following note appears: 'The above agreement was gone over carefully by the Typothetæ committee, and after considerable discussion over its merits, as well as the eight-hour day, they flat-footedly refused to consider it. We then presented the old agreement of the past five years as the only solution of the matter, and after several hours of conference it was finally agreed to and adopted, as follows, marked as "Exhibit III"'—which follows said note on said page 29, and have compared it with complainants' Exhibit No. 2, attached to the bill for injunction, in support of which bill this affidavit is made, and I find that said agreements are identical; that is to say, the 'Exhibit III' is the same agreement as set forth in complainants' Exhibit No. 2, and is the same agreement referred to in said note in which it is said that 'It was finally agreed to and adopted.' That on the same page, and referring to the same agreement referred to as complainants' Exhibit No. 2, the following paragraphs appear:

'The above agreement is practically the old agreement of the past five years; the changes in it being in hours after January 1, 1909, with a method of forming a record as to complaints against either side should occasion warrant it.

'As stated in the first of this article, the board of directors had decided that they had by vote of the convention full power to renew the agreement. This goes without question, as the signatures of all five members of the board are attached to the Newspaper Publishers' Agreement; First Vice President Murphy refusing to sign the Typothetæ agreement for reasons of his own unknown to the writer, until the final agreement was drawn up and about to be signed, although he voted with the board as a unit in their Chicago meeting in presenting the old agreement to the Typothetæ as good enough for another five years. Seeing that the convention made no changes in it *other than eight hours within a reasonable time, he agreed to January 1, 1909, as a reasonable time.*'"

The italics are mine.

Now, it seems to have been a discussion as to what would be a reasonable time within which the "eight-hour day" should be adopted. The Union, of course, sought to have it established at once, and the Typothetæ would not agree to that. As a result of the conference—and it seems to have been earnestly urged—they finally agreed upon the provision that is contained in the contract of January, 1907 (Ex-

hibit No. 2 to this bill). So far as we are advised, the contract was duly made by the two associations, and its validity has not been questioned; but since its execution President Higgins, Vice President Gordon, and Secretary and Treasurer Webb have been succeeded by Berry as president, by Breen as vice president, and by McMullen as secretary and treasurer, and the new officers and directors have demanded that the contract be modified in the respect already mentioned, and, to enforce the demand, have, as alleged in the bill, incited strikes against members of the Typothetæ who have refused to accede to the modifications, and have threatened to pursue the same policy against all other members thereof who so refuse.,

The "closed shop" is contrary to public policy, and the demand for the immediate adoption of the "eight-hour day" is violative of the contract. Now, this is the situation as I see it. This contract was made. The old officers were succeeded by new ones, who were dissatisfied with it. They insisted upon a modification of it which would recognize the "closed shop" and adopt at once the "eight-hour day." The Typothetæ stood upon its contract rights and refused to make this concession, refused to change and modify the contract made, and it is alleged in the bill that in consequence thereof strikes have been declared against certain members of the Typothetæ in different parts of the country, and that strikes are threatened as against all members of the Typothetæ who may refuse to accede or consent to the modification of the contract as demanded. Practically the Union is insisting upon a new contract.

The service of the employés, members of the Union, is neither special, extraordinary, nor unique, in the sense that it could not otherwise be supplied, and that its loss would cause irreparable injury, and it is not sought to restrain them from quitting the service of their employers, but only that their officers, agents, and representatives be restrained from inciting them to strike, unless the contract be so modified as to make provision for the "eight-hour day" and "closed shop," and to make it effective at once. It is not a question, therefore, of whether the men who work shall be enjoined from striking, but it is a question whether the officers, agents, and representatives of these men, who represent the organization and control it, shall be permitted to incite the men to strike, to induce them to strike, and thereby repudiate the contract which was made by them through their agents at the January convention of 1907. The bill charges that the executive officers and directors have conspired to force the making of a new contract which will embody these two demands, and, in the event of the refusal of the Typothetæ to agree thereto, then to enforce these demands by strikes, and that they are using their position, power, and authority to control and induce the men to strike. That, in substance, is the allegation of the bill.

The court is not asked to make an order enjoining the men from striking, and, if it were asked, would refuse to grant it, because, as already stated, no case is made, nor can be made, in which the court would compel the men to labor. They cannot be made slaves. They cannot be compelled to work, and it is not sought by this bill to compel

them to work; but it is sought to prevent the officers of the organization from using their power and influence to induce the men to strike in violation of their contract.

It is plain that these officers have great influence and power with the body of men composing this association, and if they exercise it unlawfully—exercise it for the purpose of repudiating the contract—they may be restrained from exercising such power and influence, although the men themselves cannot be restrained from striking, or from walking out, at any time, and refusing to work. In a word, the proposition dealt with is this: May the officers of this organization, in violation of this contract, induce, influence, incite, or coerce the men into resorting to a strike to compel a modification of the contract? Shall they be permitted to do that?

Now, after having carefully read these pleadings, the affidavits, and the different exhibits, it seems to me plain that in January, 1907, a contract was completed between these two associations, after a contest over these very questions that are now raised, and it was believed by those representing the Union at that time that the best thing they could do would be to accept the proposition to make the "eight-hour day" operative in 1909. They felt compelled to accept that as a reasonable time. It was a question as to what would be a reasonable time, and from their point of view a reasonable time was at once. The other side sought to postpone it as long as possible, and finally a compromise was reached fixing 1909 as the time. When the new officers came in, they were dissatisfied with the action of the old board of directors and of the officers and with the convention. They thought that those men should have made a stronger fight. They felt that the Union had not been fairly treated; that if they had stood out as they should have done they could have shortened the time. They felt aggrieved. Then they made the demand that this contract, which had been made by the old board and officers, should be modified to meet their wishes, or that they would not abide by it.

I am compelled to dispose of this case upon what appears in the bill and the accompanying affidavits. There is no answer, and no affidavits on behalf of the defendants, except the ones I have read. I am now disposing of the application practically upon what is shown by this bill. It is shown by the bill that, being advised of this contract, they advised the men to repudiate it, to demand that the "eight-hour day" be made operative at once, and also the "closed shop," and to enforce the demand they threatened strikes, and it is alleged that strikes have been entered upon in Chicago, and other places throughout the country, and that a strike will be instituted against every member of the Typothetæ unless it consents to this modification of the contract.

Now, so far as the men are concerned, if they take it into their own hands, they may walk out, but this court is asked to stay the hands of the officers who manage and control this organization, who have power to influence, to incite, to put on foot these strikes, who have all the machinery in their hands, and who seek to use it to induce and incite these men to violate a contract that was fairly made.

I am of the opinion, therefore, that a case is made requiring that

these officers, named, be enjoined, in the respects prayed in the bill, from exercising their power, their control, and their influence to induce strikes for that purpose.