CITY OF LEESBURG v. G. G. WARE, *et al.,* as Bond Trustees of the City of Leesburg and First National Bank of Leesburg, Florida.

153 So. 87.

Division A.

Opinion Filed January 18, 1934.

Petition for Rehearing Denied March 1, 1934.

*J. M. Austin, A. S. Herlong, Jr., W. F. Robinson* and *Waller & Pepper,* for Appellant;

*Gaines & Futch* and *Duncan, Hamlin & Duncan,* for Appellees.

ELLIS, J.—The City of Leesburg appealed from a decree entered by the Judge of the Circuit Court for the Sixteenth Judicial Circuit dismissing the city's bill of complaint exhibited in that court against G. G. Ware, J. C. Lee and

A. L. Miller, as bond trustees of the city, and against The First National Bank of that city. The decree also ordered the costs to be assessed against the city and allowed reasonable solicitor's fees to be paid out of the trust fund in the hands of the trustees.

The bill of complaint sought an accounting from the trustees of all monies which they received and handled as bond trustees of the city, and an order declaring the sale to the trustees by G. G. Ware of certain bonds of the town of Palmetto to be null and void, and requiring the First National Bank to place to the credit of the trustees to be held in the sinking fund of the 1923 Extension Bond and Improvement Fund the sum of $15,300.65, with interest from July 29, 1929, and for general relief.

The sum asked to be refunded by the bank is the amount which the bank on the above date received from the trustees in payment for the Palmetto bonds.

The grounds set forth in the bill for the relief prayed are as follows in substance succinctly stated.

The city by ordinance made provision for the appointment of certain bond trustees who were to receive from the city certain funds to be invested in approved securities as a sinking fund for the 1923 improvement extension bonds of Leesburg; that Ware, Lee and Miller were the bond trustees and as such every year from June, 1924, to May, 1930, received from the city certain sums of money amounting to $3,334.34 each year; that they failed to invest the money as the ordinance required and on July 29, 1929, purchased from the First National Bank bonds of the city of Palmetto paying therefor $15,300.65; that the bonds at the time of purchase had no marketable value and were not approved securities and had not been approved by the City Commission of Leesburg; that G. G. Ware, while acting as

bond trustee and secretary to the trustees, was President of the First National Bank of Leesburg and as president of the bank and secretary to the trustees made the transaction without the knowledge or consent of his co-trustees Lee and Miller; that the transaction was effected by cancelling a certificate of deposit held by the trustee and issued by the bank in the sum of $14,509.22, supplementing the difference from funds in the bank to the credit of the trustees.

The answers of the trustees and the bank contained no averments of fact of material importance different from those averred in the bill. There was a denial that the Palmetto bonds at the time of the transfer were of no marketable value and that the trustees had failed or refused to give an accounting to the proper legal authorities of the city, and averred that the purchase of the Palmetto bonds was made in good faith and at the time were considered good securities and the bank made no profit on the transaction.

Appellants contend that the transaction was a violation of Section 7472 of the Compiled General Laws, 1927; that it was a violation of public policy and a fraud in law which entitles the trustees to a rescission of the purchase and an order requiring the bank to restore the money paid for the bonds and that it was improper for the chancellor to award solicitors' fees to the trustees out of the trust funds in their hands.

The bonds when purchased were not in default and there is no evidence that they were not at the time of the purchase of the value which the trustees paid for them and the city ordinance does not require the municipal authorities to ratify or approve investments made by the trustees, nor does it define "approved securities." The evidence does not tend to show that the trustees ever failed or refused to

account to the city authorities but on the contrary their accounts were always open to inspection and were examined at the city's request by auditors for the city's information and in two such audits the purchase of the bonds were mentioned. The suit was begun two years after the transaction and nearly that long after the maturity date of the bonds.

It appears that there was no suspicion of fraud in the transaction; that Mr. Ware acted for the trustees, if not at their express request, certainly by implied permission, and in the best of good faith and in the interest of the fund. because he deemed it prudent in view of the precarious condition of the times to remove the money from the bank and invest it in municipal bonds authorized by legislative enactment to be issued.

Section 7472, C. G. L., 1927, does not apply. The bonds purchased by the trustees were neither supplies, goods nor materials. In the first place it is a criminal statute and should be construed strictly. Atlantic Coast Line R. Co. v. State, 73 Fla. 609, 74 South. Rep. 595.

Nothing should be regarded as included within its meaning that is not within its letter and spirit. If there is doubt or ambiguity in its provisions leaving a doubt as to their meaning the provisions are to be construed in favor of life and liberty. Snowden v. Brown, 60 Fla. 212, 53 South. Rep. 548; Sanford v. State, 75 Fla. 393, 78 South. Rep. 340; Texas Co. v. Amos, 77 Fla. 327, 81 South. Rep. 471.

The bond trustees were not municipal officers in the sense that they performed any governmental function. Indeed the city had no power from the Legislature to constitute them such. The mere fact of their election by the citizens did not of itself constitute them officers of the city government. This Court held in Charlotte County v. Chadwick,

102 Fla. 163, 135 South. Rep. 502, that county board trustees provided for by statute were not county officers, not only because they were not appointed or elected but because they do not perform such functions as would make them officers.

The trustees in this case are just what their title implies, trustees or agents for the city, charged with the trust of holding money for certain purposes and investing it to the best interests of the city within their judgment.

We perceive nothing in the transaction on the part of Mr. Ware that indicates that he had either for himself or his bank a sinister purpose in purchasing the bonds from the bank of which he was president, and nothing on the part of the other two trustees but an improvident, careless, shirking of duty in intrusting business of that character to any one to perform. If what they did was within the contemplation of the law it was scarcely worthwhile to have more than one trustee. They may be subject to censure for what they did although their motives appear to have been entirely worthy.

Whether the transaction was *per se* fraudulent or against public policy and void is the next question presented by the brief. The bank through its president, Ware, sold the Palmetto bonds to the trustees through its secretary, Ware, the same person. Mr. Ware acted in two capacities, as agent for the bank and as agent for the trustees of whom he was one. How could he serve the interests of both principals? If as president of the bank he had any information that led him to believe that the Palmetto bonds were precarious securities, or that owing to economic conditions and resultant reduction in the revenue collecting capacity of the Town of Palmetto that would impair the market value of its bonds, or that rendered likely or even

slightly probable a default in the payment of interest or principal, he was in duty bound to the City of Leesburg to avoid the purchase, at least impart the information to his co-trustees or to the city government, his employer, whether the ordinance required its approval or not. If on the other hand he knew the bonds to be perfectly sound securities but doubted the safety of the bank of which he was president as a safe place for keeping on deposit of the city's monies, his obligation was equally strong to impart the information to his co-workers and discuss the situation with his colleagues of the bank.

It is difficult for any man to serve two masters. Matthew said: "No man can serve two masters; for either he will hate the one and love the other, or else he will hold to one and despise the other." That is a fundamental doctrine which the experience of many generations of men has woven into the fabric of their municipal law. It permeates the judiciary like a vein of vitalizing force. No man can be judge in his own cause, is a mere variation of the principle.

The doctrine may be scoffed at by self-conceited people swept off their feet by a little brief authority, or secure in the self-sufficient opinion of their own rectitude, but to countenance the practice as meeting the approval of the law would be to open the way to a saturnalia of fiscal debaucheries and invite the venal corruptionist into the home of decent business.

Public policy is a term that is vague and uncertain of meaning and of variable quantity and has been said not to be susceptible of exact or precise definition. 50 C. J. 857; McGuffin v. Coyle, 16 Okla. 648, text 670, 85 Pac. Rep. 954, 6 L. R. A. (N. S.) 524; Baltimore Humane Impartial Soc. & Aged Women's & Aged Men's Homes Soc. v. Pierce, 100 Md. 520, text 526, 60 Alt. Rep. 277, 70 L. R. A. 485;

Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 South. Rep. 761.

The subject however has been ably discussed by Mr. Justice WANAMAKER in Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Kinney, 95 Ohio St. 64, 115 N. E. Rep. 505, L. R. A. 1917-D 641. His language is herewith quoted:

"What is the meaning of 'public policy?' A correct definition, at once concise and comprehensive, of the words 'public policy,' has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word 'fraud' or the term 'public welfare.' In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

"Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and convictions of the people,—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary priniciples of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our public politic. When a course of conduct is cruel or shocking to the adverse man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court. It has frequently been said that such policy is a com-

posite of constitutional provisions, statutes, and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public Policy is the cornerstone—the foundation—of all Constitutions, statutes, and judicial decisions and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.

"This is recognized in three well-known and well-considered Ohio cases. Central Ohio Salt Co. v. Guthrie, 35 Ohio St. 666; State, *ex rel*. American U. Teleg. Co. v. Bell Telep. Co., 36 Ohio St. 296, 38 Am. Rep. 538; and Lake Shore & M. S. R. Co. v. Spangler, 44 Ohio St. 471, 58 Am. Rep. 833, 8 N. E. 467."

It may be safely stated, as a sound or accurate standard by which to determine the applicability of the rule, that no phase of private relations shall be contrary to public policy; that when a contract contravenes an established interest of society it is void as against public policy, and for one person to undertake to be the agent for two persons trading at arms length with one another contravenes an established interest of society.

Regardless of the element of profit or loss to the bank,

the transaction was void as against public policy and *per se* a legal fraud.

The foregoing statement, insofar as it sets forth the principles of law applicable to a case like this, are agreed to by the entire Court. But a majority of the Court, consisting of Mr. Chief Justice DAVIS, Mr. Justice WHITFIELD and Mr. Justice TERRELL and Mr. Justice BUFORD, are of the opinion that since no actual fraud, or corrupt purpose, on the part of the particular defendants below was either alleged or established in this case, that the decree of the chancellor dismissing the bill of complaint on its merits should accordingly be affirmed on the ground that the right of the City of Leesburg to have had the transaction complained of rescinded, vacated and set aside by a court of equity because of the fact that the city's bond trustees had undertaken to enter into and carry out a transaction which was contrary to public policy and void in its inception and while still executory (see Gary v. Kissimmee River Cattle Co., 85 Fla. 268, 95 South. Rep. 657) has now been barred by the city's laches in delaying more than two years to bring its bill of complaint attacking the same, which bill of complaint was not brought until long after the transaction was fully accomplished and the position of the parties to it so materially changed that it is now practically impossible to put the parties in *statu quo,* or to do substantial justice between them.

To grant a personal money judgment decree against the defendants G. G. Ware, J. C. Lee and A. L. Miller, as prayed for in the bill, by requiring these defendants to place back to the credit of the bond trustees of the City of Leesburg the sum of $15,300.65 which is the amount admittedly, and without any actually fraudulent or corrupt intent, paid out by them out of the trustees' funds for purchase of City

of Palmetto bonds which the City of Leesburg so far as the record shows, still retains for what they are worth, would in the view of the majority of the Court, be the legal equivalent of the enforcement by this equitable proceedings of a money penalty in the amount claimed against the defendant and therefore is not authorized in the light of the equities which this Court finds should be held to exist between the parties.

The decree is therefore affirmed.

The writer, however, does not agree to the conclusion nor to the reasoning offered to support it by Mr. Chief Justice DAVIS, Mr. Justice WHTIFIELD, Mr. Justice TERRELL and Mr. Justice BUFORD. The doctrine of laches does not apply, nor is the matter of fraud or corrupt practice any part of the case. The writer expressly states in the opinion "that there is no suspicion of fraud in the transaction." Laches in legal significance is not merely delay but delay that works a disadvantage to another. So long as parties are in the same condition it matters little whether one presses a right promptly or slowly within limits allowed by law. 10 R. C. L. 396.

There is no element of acquiescence in the city's delay for two years to seek an accounting because acquiescence implies active assent and it cannot be said that the city actively assented to the transaction. The case of Gary v. Kissimmee River Cattle Co., *supra*, in the view I have of the case, has no bearing upon the question, except that the language of the opinion expressly states that the impropriety of a cashier, or other officer of a bank, continuing as a trustee of county bond funds when such funds are deposited in the bank of which he is an officer, is manifest where the interests conflict.

It seems to me to be merely a misuse of words to say that

the interests of the city and the bank were not conflicting in the transaction under consideration. It is very doubtful whether in this case the matter involving a public or governmental right, laches will apply. See 6 McQuillin on Municipal Corporations 511.

The transaction in this case affords a clear illustration of the condition which has prevailed in many jurisdictions and which has led the government in some States, particularly New York, to prohibit the investment of trust funds by institutions holding such funds in securities owned by the corporation which they happen to have in their vaults. I therefore think the decree should be reversed.

Affirmed.

Davis, C. J., and Terrell, J., concur.

Whitfield, P. J., and Brown and Buford, J. J., concur in the opinion and judgment.