W. V. KNOTT, as Insurance Commissioner of the State, v. STATE, *ex rel.* GUARANTY INCOME LIFE INSURANCE COMPANY.

186 So. 788.

Opinion Filed January 31, 1939.

Rehearing Denied March 10, 1939.

*George Couper Gibbs,* Attorney General, and *John L. Graham,* Assistant Attorney General, for Plaintiff in Error;

*H. R. Wells, Weldon G. Starry, B. K. Roberts* and *Gamble & Gamble* (New Orleans, La.) for Defendant in Error.

THOMAS, J.—The judge of the Second Judicial Circuit issued an alternative writ of mandamus directing the State Treasurer, *ex officio* Insurance Commissioner, to delete from the following certificate authorizing relator, a foreign corporation, to do business in Florida, the paragraph shown in italics:

"CERTIFICATE OF AUTHORITY
"STATE OF FLORIDA
"OFFICE OF THE STATE TREASURER

"Tallahassee, May 9, 1938.

"The Guaranty Income Life Insurance Company of Baton Rouge, Louisiana, having filed a satisfactory financial

statement in accordance with the laws governing such company or association is hereby authorized to transact business in this State until the first day of March following date of this Certificate subject to compliance by said company with all the laws regulating such company or association in this State.

"It is expressly understood that this Certificate of Authority does not extend authority to the above named Company to issue its so-called policy. Endorsement at Age 70, with Special Endowment Benefits, or any other policies of a similar plan in the State of Florida. The Company heretofore submitted this particular policy form for approval stating unless it could write this particular form of policy in Florida, application for authority to transact business in this State would not be made. The policy form and plan were disapproved.

"Application is now made to write general life insurance business and permit is hereby granted, but expressly prohibits the writing of the aforementioned policy form or any other similar policies in the State of Florida.

"W. V. KNOTT (S)
"State Treasurer."

A peremptory writ was, upon motion therefor notwithstanding the return, issued.

The portion of the proposed policy to which the Commissioner found objection is:

"14

Classification by Entry Age and Calendar Year of Issue — Policies issued on this plan are automatically placed into Classes determined by two factors, which are: (1) Entry-Age of the policy holder (the age of the in-

sured at nearest birthday), and (2) the Calendar Year in which the Policy is issued. Policies issued during the same Calendar Year to persons of the same Entry-Age shall constitute a Special Endowment Benefit Class.

"15

Amount and Maturity of Special Endowment Benefit Fund

The Special Endowment Benefit Fund available for policies in this Class shall always equal the Face Amount of the Policy or policies in this Class under which the Company experiences a mortality loss. Special Endowment Benefit shall become due and payable immediately upon receipt by the Company of due proof of each such mortality loss.

"16

Distribution of Special Endowment Benefit Fund

Policies in the same class shall share in the distribution of the Special Endowment Benefit Fund, each in proportion to its Face Amount. This policy shall receive its share of the Special Endowment Benefit Fund (the ratio of its Face Amount to the sum of the Face Amounts of all policies in the same class) upon each maturity thereof for this class to the End of the Endowment Period, provided this policy shall have been kept in force on a premium-paying basis. In the event of the death of the insured hereunder while this policy is in force on a premium-paying basis, the bene-

ficiary shall be entitled to share in the Special Endowment Benefit Fund then available for this Class, in the ratio of its Face Amount to the sum of the Face Amounts of all policies in the same class."

The objection to the policy raised by the plaintiff in error is that one feature of it described in the above quoted portions is a wagering contract.

The contract provides for paying to insured the sum of one thousand dollars upon his reaching the age of seventy or, upon his death, the same amount to the beneficiary. In addition it contains provisions above set out, and objected to by the plaintiff in error, whereby insured receives upon the death of each policy holder of his age and insured in the same year a sum equal to the ratio the face amount of the policy bears to the total of the face amounts of all policies in the same class. Thus if all policy holders in the same class except one should die before reaching the age of seventy years the sole survivor would have received his proportionate share on each death and the beneficiary of the first to die would have received only the first allotment.

We have examined the case discussed by counsel for the respective parties, Colgrove v. Lowe, 343 Ill., 360, 175 N. E. Rep. 569, and do not find where the policy there declared to be against public policy differs in principle from the one we are considering. The Supreme Court of Illinois condemned an insurance contract whereby a definite number of persons took out policies naming a trust company as beneficiary trustee. It was agreed by all that premiums would be paid for five years. In the event of death of any one of the group his insurance was to be paid 75 per cent. to the beneficiary, and 25 per cent. to the beneficiary trustee for

proration among the survivors. As in the instant case, the policy studied by the Illinois Court contained certain provisions which were unobjectionable. It was said there that: "it has been uniformly held that a contract of insurance upon a life in which the insurer has no interest is a pure wager, that gives the insurer a sinister counter-interest in having the life come to an end." 175 N. E. Rep. text 571.

Clearly, the holder of one of the policies of defendant in error would profit by the death of another in his class as did a contract holder under the Colgrove system, and it is plain, too, that here, as there, the one policy holder in the same group has no more interest in the continuance of the life of the others.

The above cited case was determined by the public policy of the State but it is maintained by defendant in error that public policy does not forbid the issuance of policies containing the above quoted "Special Endowment Benefit" clause.

A discussion of the subject "public policy" may be found in Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 South. Rep 761, text pages 785 and 786. To be void because of this infirmity the agreement must appear "injurious to the public" interest or have a "bad tendency" or contravene established interests of society.

We think a wagering contract is against the public policy of the State of Florida despite Chapter 17947, Acts of 1937, giving to Fraternal Benefit Societies the right to fix classes and provide benefits from special funds to the oldest member of the class upon death of another member.

The following is quoted from the statute of 14 George III, Cap. XLVIII, (See Summary of British Statutes, part of the Common Law of Florida under Section 87 C. G. L. 1927, Published Under Supervision of the Attorney General State of Florida, January, 1931.)

"WHEREAS *it hath been found by experience, that the making infurances on lives, or other events, wherein the affured fhall have no intereft, hath introduced mifchievous kind of gaming*: For remedy whereof, be it enacted by King's moft excellent majefty, by and with the advice and confent of the lords fpiritual and temporal, and commons, in this prefent parliament affembled, and by the authority of the fame, That from and after the paffing of this act, no infurance fhall be made by any perfon of perfons, bodies politick or corporate, on the life or lives of any perfon or perfons, or on any other event or events whatfoever, wherein the perfon or perfons for whofe ufe, benefit, on on whofe account fuch policy or policies fhall be made, fhall have no intereft, or by way of gaming or wagering; and that every affurance made, contrary to the true intent and meaning hereof, fhall be nul and void, to all intents and purpofes whatfoever."

In considering a fire insurance policy, Phenix Ins. Co. v. Hilliard, 59 Fla. 590, 52 South. Rp. 799, text page 801, Mr. Chief Justice WHITFIELD wrote:

"Wager policies are not approved and should be avoided."

Having concluded that the "Special Endowment Benefit" is a wagering contract, hence contrary to public policy in this State, we pass to the remaining question whether the State Treasurer as Insurance Commissioner, had power to insert in his certificate the restriction that no policy should be issued containing this plan.

We do not find in Section 6197 *et seq.* C. G. L. 1927, specific power given the State Treasurer to pass upon the type of contracts to be issued but they do confer upon him supervision of companies engaged in the insurance business, and prohibit them from selling insurance without having first obtained his permission to do so. He must be fur-

nished with a sworn statement on a form "adopted by the National Convention of Insurance Commissioners.

His certificate recites that the "particular policy form" was submitted by the Company and disapproved.

We do not think that in all the circumstances the relator showed a clear legal right to the writ commanding the State Treasurer to omit the restriction in his certificate in view of our finding that the sale of insurance in the form described would be violative of the public policy of the State. See State v. Greer, 88 Fla. 249, 102 South. Rep. 739, 37 A. L. R. 1298; State v. Atlantic Coast Line R. Co., 53 Fla. 650, 44 Soth. Rep. 213, 13 L. R. A. (N. S.) 320, 12 Ann. Cas. 359; State v. Carey, 121 Fla. 515, 164 South. Rep. 199.

The judgment of the lower court is reversed.

TERRELL, C. J., and WHITFIELD, BROWN, and CHAPMAN, J. J., concur.

BUFORD, J., dissents.

BUFORD, J. (dissenting)—The history of the case is set out in the opinion prepared by Mr. Justice THOMAS and it is, therefore, not necessary to reiterate it here.

I am unable to find any statutory authority vested in the State Treasurer as *Ex officio* Insurance Commissioner to deny the petitioner authority to write such a policy as is contemplated and described in the opinion by Mr. Justice THOMAS. The State Treasurer's power and authority in this regard is defined by statutes 4247 *et seq.* R. G. S., 6197 *et seq.* C. G. L.

It is not contended that the policy sought to be written by the petitioner is financially unsound but it is admitted at the bar of this court that the plan proposed is financially sound.

So whether or not the Circuit Court must be affirmed

depends on whether or not the policy contemplated is a wagering contract and as such is contrary to public policy.

All insurance contracts may be loosely termed wagering contracts but all are not contrary to public policy. For instance, an insurance company issues an ordinary life policy on an insured person at the age of 35 years. The net premium for a $1000 policy would be $8.69. The insurance company is in effect betting $1000 to $8.69 that the insured will live one year, while the insured is wagering $8.69 against $1000 that he will not live a year. The ratio is approximately 115 to 1, but this is not the foundation of the transaction. The foundation of the transaction is the experience of years which have been compiled under what is known as the tables of mortality. By the use of these tables based on experience, it is found that of 100,000 persons, beginning at the age of ten years, it is calculated that a certain number will die each year. The result of this experience is that 749 of them will die the first year, 746 the second, and the number will continue to be reduced until the last 3 will die during the 95th year and none be living at the beginning of the 96th year. On this basis, what is actually done is to ascertain what amount shall be contributed by all persons in any given class entering in any given year so that the beneficiaries of such persons who die during the life of the policy will receive an agreed amount, and when this is determined it constitutes the basis for level annual premiums sufficient in the aggregate to create a fund which will meet the insurer's obligation to the beneficiaries as deaths of the insured occur in accordance with the expectancies established by the mortality tables.

As heretofore stated, the policy involved represents a sound contract based upon legitimate principles of life insurance. The specimen policy under attack is of class is-

sued at age 35, amount of policy $1000, annual premium $50.71. The policy matures when the insured reaches the age of 70 years and is then payable in the face amount of the policy to the policy holder. It contains the following clauses:

"Upon the maturity of this policy as an old age endowment which shall occur in the anniversary of this policy nearest the Insured's seventieth birthday, which is the End of the Endowment Period hereof; or will pay ONE THOUSAND Dollars (on face amount of this policy) immediately upon receipt at its Home Office in the City of Baton Rouge of due proofs of the death of the said Insured, while this Policy is in full force and before the Maturity of the Endownment hereunder, to the beneficiary Mary Doe, wife of the Insured (or to such other beneficiary as may be designated by the Insured), if living, otherwise to the Insured's executors, administrators, or assigns, subject to all of the Benefits, Privileges and Conditions stated on this and the following pages hereof.

"Special Endowment Benefits

"This Policy shall share in the distribution of Special Endowment Benefits with those policies of the same age and class. The Special Endowment Benefits shall be due and payable when and so often as the Company experiences a loss in this Class, as hereinafter provided."

Under Special Endowment Benefit it contains the following clauses:

"Policies issued on this plan are automatically placed into Classes determined by two factors, which are: (1) Entry Age of the Policyholder (the age of the insured at nearest birthday and (2) the Calendar Year in which the policy is issued. Policies issued during the same Calendar Year to

persons of the same Entry-Age shall constitute a Special Endowment Benefit Class.

·"The Special Endowment Benefit Fund available for policies in this Class shall always equal the face amount of the Policy or Policies in this Class under which the Company experiences a mortality loss. Special Endowment benefit shall become due and payable immediately upon receipt by the Company of due proof of each such mortality loss.

"Policies in the same Class shall share in the distribution of the Special Endowment Benefit Fund, each in proportion to its Face Amount. This policy shall receive its share of the Special Endowment Benefit Fund (the ratio of its Face Amount to the sum of the Face Amounts of all Policies in the same Class) upon each maturity thereof for this Class to the end of the Endowment Period, provided this policy shall have been kept in force on a premium-paying basis. In the event of the death of the insured hereunder while this policy is in force on a premium-paying basis, the beneficiary shall be entitled to share in the Special Endowment Benefit Fund then available for this Class, in the ratio of its Face Amount to the sum of the Face Amounts of all policies in the same class."

An analysis of the provisions shows that the policy is one of endowment at age of 70 years which means that all holders of the same Entry-Age of the same calendar year have agreed to contribute, that is to pay premiums in the amount named, which are to create an insurance fund out of which those who die before reaching the age of 70 will receive a fixed face amount named in the policy, and if the policy-holder lives until he attains the age of 70 he will receive the fixed face amount of the policy.

(2nd) The holders of these policies of the same Entry-age and calendar year have agreed also to contribute each

as long as he shall live, less than to the age of 70 years, a part of this same premium to create an additional fund which will not await until all policy holders reach the age of 70 for distribution but which fund will be distributed to the beneficiary of any policy-holder who dies and to all surviving policy holders at the death of any policy holder. This distribution is made as often as a policy in the class matures by death of a policyholder. It is a thing that is contemplated in the contract in the beginning and is paid for by each of the insured.

(3rd) The amount agreed upon for such additional interim and proportionate distribution is fixed at the same amount that will be payable at the death of any one of them, which amount will be variable only according to the face amount of the policy of the then deceased policy holder. By contract this additional amount could be fixed at an amount certain to be paid at stated intervals or upon the occurrence of any particular event. It might be more or less than the face amount of a policy maturing by death of the policy holder or it might be the same, but in this proposed policy it is fixed at the amount of the policy held by the then deceased policyholder.

There is no advantage of one policyholder over another because they are each required to pay the same amount of premium per annum for like amount of insurance. If a policyholder dies within the first year of the insurance period his beneficiary receives an amount of the additional endowment created in that proportion which the amount of his insurance bears to the aggregate amount carried by the entire Class. Those who die later pay their respective premiums to keep the policy in force and the amount of the endowment is increased in proportion as the number of the Class decreases. In other words, they pay more and get more.

We find no aspect which brands this as a wagering con-
tract. In Sawyer v. Dodge County Mutual Insurance Co.,
37 Wis. 507, it is said:

"A wagering policy is one which shows on the face of it
that the contract which it embodies is really not insurance,
but a wager; a pretended insurance founded on an ideal
risk where the assured has no interest in the thing insured."

The Supreme Court of New York, Appellate Division,
in the case of Steinback v. Diepenbrock, et al., 37 New York
Supplement page 279, said:

"It is said that the assignment of the policy to Erdtmann
is not valid because it appeared that he had no insurable
interest in the life of Diepenbrock. It is, no doubt the rule
that if one takes out a policy of insurance upon the life of
another, in which he has no interest, the policy is a pure
wager policy, and void. Ruse v. Insurance Co., 23 N. Y.
516. But, where one takes out a policy on his own life, it
is a valid contract and becomes operative just as soon as it
is perfected. It is practically a promise on the part of the
insurer to pay a sum of money to the insured upon the hap-
pening of a condition. As such it is a valid contract
properly a subject of sale, and is valid in the hands of any
person to whom it is assigned for value."

Is the case of Colgrove, et al., v. Lowe, et al., 343 Ill.,
360, 175 N. E. 569, it is said:

"Public policy forbids one person who has no interest in
the continuance of the life of another from speculating on
that life by procuring a policy of insurance. On the other
hand, our courts have repeatedly held that one may insure
his own life for the benefit of another having no insurable
interest therein. Bloomington Benefit Ass'n. v. Blue, 120
Ill., 121, 11 N. E. 331, 60 Am. Rep. 558; Hawley v. Aetna
Life Ins. Co., 291 Ill., 28, 125 N. E. 707. And it has also
been held that one who has insured his own life may in
good faith, by an assignment of the policy, provide for the

payment of the insurance money to an assignee who has no insurable interest in the life insured. Stake v. Stake, 228 Ill., 630, 81 N. E. 1146; Martin v. Stubbings, 126 Ill. 387, 18 N. E. 657, 9 Am. St. Rep. 620; Hawley v. Aetna Life Ins. Co., *supra*; Grigsby v. Russell, *supra*."

A three-Judge Federal Court, in the District Court of the United States for the Western District of Oklahoma, in the case of Liberty National Life Insurance Company v. Read, reported 24 Federal Supplement 103, had under consideration a policy very much like the one here under consideration, the chief difference being that in that policy the contingent mortality endowment provided for the payment of principal amount to the insured when his, or her, policy shall become the oldest policy in the division of his, or her, entry-age class which had fewest policies in it at the time he, or she, became a policyholder and a death thereafter occurs in that division; whereas, in the policy before us the contingent mortality endowment provides for the payment at the death of a policyholder of pro rata part of an amount equal to the face of the policy of the deceased holder to the beneficiary and to each and every other policy holder in the class.

In that case the court said (page 105):

"The Perfection Endowment Policy is (1) a life insurance policy providing for payment of principal amount to insured's beneficiary upon his, or her, death; (2) an old-age endowment providing for payment of principal amount to the insured upon his or her attaining age of 85 years, and (3) a contingent mortality endowment providing for payment of principal amount to insured when his or her policy becomes oldest policy in division of his entry-age class which had fewest policies in it at time he or she became a policyholder and a death thereafter occurs in that division.

"Each of the three benefits so provided in the policy

covers an insurable risk. Each of the events insured is known and certain and the time of its happening being only contingency, is predictable and insurable through application of long-established experience tables of mortality. The amount of each benefit is the face of the policy, and under universally accepted principles of cost accounting the premiums are calculated so that they with the interest thereon, will be sufficient in each case to pay the benefit promised upon the happening of the event maturing the claim. For the security of the policyholder adequate reserves are set aside out of premiums collected and these are calculated just as are the reserves of all life insurance policies upon the American Experience Table of Mortality with interest assumption of $3\frac{1}{2}$ per cent, there being no forfeiture for lapse. The insured may at any time exchange his policy for any other policy providing other benefits and have the new policy dated back to the time of his or her original application so as to preserve his or her earlier age and lower premium rates, and upon such exchange the difference in reserves must be adjusted and paid to the insured or by the insured according as his or her new policy calls for a lesser or greater reserve than his or her Perfection Endowment Policy.

"Rates and reserves on this policy were calculated under supervision of plaintiff's president, Frank P. Samford, by F. M. Speakman, consulting actuary of Insurance Department of Alabama, sometimes consulting actuary of the Oklahoma Insurance Department. Same were verified by George Dyre Eldridge, author of the Fraternal Congress Table of Mortality, declared by Oklahoma law to be an accepted standard of mortality experience, who wrote an opinion showing that they were actuarily sound, assuring permanence and certainty of result and fulfillment essential to all life insurance. The sufficiency of said rates and re-

serves has been demonstrated by 37 years' operation. The promised benefits are plaintiff's unconditional obligation and a charge on all its assets, of which more than two million dollars is held in reserve against that obligation."

The policy here under consideration is not amenable to the criticism which the Supreme Court of Illinois directed to the policy involved in the case of Colgrove v. Lowe, etc., *supra*. The Court described that policy and criticised it as follows:

"By the Colgrove system an applicant for life insurance is offered not only the usual indemnity, investment, savings, loan, cash surrender, and other features incident to the modern life insurance policy, but is at the same time offered a contract by means of which he will be allowed to share pro rata, during a five year period, in a trust fund or pool to be created by the deposit, of one-fourth of the proceeds of life insurance moneys paid on account of the death of any of the other contracting members, not exceeding ninety-nine in number. The applicant, in order to share in the benefits of this contract, likewise agrees that in case of his death during the five year period the trustee named shall deposit 25 per cent of the proceeds of his policy in the trust fund for the benefit of the surviving parties and pay the other 75 per cent to his estate or other beneficiaries named. The inducement or consideration held out to the applicant for life insurance by this method is the chance to profit, if he lives, by the early death of one or more of the other ninety-nine contracting parties in whose lives he cannot possibly have any insurable interest. A direct financial gain is anticipated by the application of part of the insurance carried by the members who die to help reduce the premiums on the insurance carried by those who live. The applicant thus expresses his willingness to forfeit 25 per cent of the insurance money which would otherwise be paid to his own

beneficiaries if he died during the first five years, for what he thinks is a better chance to live during this five year period and participate in some of the death dividends of his contemporaries. This is nothing but speculation in human life and as such the contract is void as a wagering contract. The very basis of the scheme is a wager for personal profit—an opportunity to speculate on one's chances of outliving the other members. The trust fund created by the death of any of the contracting parties is a sum of money of which the trust company is the stake-holder, under an agreement to divide the sum among the winners, who are to be determined by the chances of· life. The different contracting parties have·no insurable interest in the lives of one another, and to allow them to benefit by the death of others of their number is to allow them to do indirectly by a contract that they are not allowed to do directly."

The contract as described by the Supreme Court of Illinois is entirely different from the contract involved here.

In the Colgrove case each of the insured agreed that for a period of five years a trust fund or pool should be created by the contribution of 25 per cent of the face of the policies held by insured in that class who should die during the five year period and that this fund created from the proceeds of insurance would at the end of the five years be pro-rated to the surviving policy holders. ` Thus it was provided that each policy holder agreed that if he should die within five years 25 per cent of the amount due his beneficiary would be placed in a trust fund and at the end of five years all sums so placed in the trust fund would be paid the surviving policyholders and in consideration of this agreement the policyholder was to receive his pro rata share of the trust fund, should he live beyond the five year period, and

thereby benefit directly from the death of those policy-holders who die within the five year period.

No such condition is found in the policy here under consideration and, therefore, the Colgrove case has no controlling effect in the instant case.

The public policy of the State must be found in its Constitution, its statutes or its court decisions. If the Constitution fixes the public policy then neither statutes nor court decisions may go contrary to the standards so fixed. If the Constitution is silent but a public policy is fixed by statutes then insofar as the statutes reach without violating organic law the courts may not contravene by decisions the standards fixed by statute. Insofar as the question now before us is involved, the Constitution is silent but the Legislature has spoken and by the terms of Chapter 17947, Acts of 1937, it is provided:

"Any fraternal benefit society now operating in this State or that may hereafter seek admission to do business in this State may issue benefit certificates to its members in accordance with its laws providing for the establishment of its membership into divisions and classes of the same age and entry, and may provide in its laws and certificates for the payments of benefits from special funds created for such purposes to the oldest membership of a division and class upon the death of a member in the same division and class."

So, here the State Legislature has authorized the issuance by fraternal benefit societies policies identical with that which was under consideration in the case of Liberty National Life Ins. Co. v. Read, *supra,* which necessarily includes the privilege of writing such policies as that which is here under consideration. Having established this as a statutory law it cannot be reasonably asserted that the writing of such policies by what is known as old-line insurance

companies should be prohibited because of being contrary to State public policy.

In the case of City of Leesburg v. Ware, *et al.,* 113 Fla. 760, 153 Sou. 87, it was said:

" 'Public policy' is a term that is vague and uncertain of meaning and of variable quantity and has been said not to be susceptible of exact or precise definition. 50 C. J. 857; McGuffin v. Coyle & Guss, 16 Okl. 648, text 670, 85 P. 954, 86 P. 962, L. R. A. (N. S.) 524; Baltimore Humane Impartial Soc. Aged Women's & Aged Men's Homes v. Pierce, 100 Md. 520, text 526, 60 A. 277, 70 L. R. A. 485; Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 So. 761.

The subject, however, has been ably discussed by Mr. Justice Wanamaker in Pittsburg, Cincinnati, Chicago & St. Louis Railway Co. v. Kinney, 95 Ohio St. 64, 115 N. E. 505, 506, L. R. A. 1917D, 641, Ann. Cas. 1918B, 286. His language is herewith quoted:

" 'What is the meaning of " 'public policy' " ? A correct definition, at once concise and comprehensive of the words 'public policy' has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word 'fraud' or the term 'public welfare.' In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

" 'Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and

right between man and man. It regards the primary principles of equity and justice and is sometime expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute, or decree of court. It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all constitutions, statutes and judicial decisions; and its latitude, its longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.'

" 'This is recognized in three well known and well considered Ohio cases. Central Ohio Salt Co. v. Guthrie, 35 Ohio St. 666, State, *ex rel.* American U. Teleg. Co., v. Bell Telep. Co., 36 Ohio St. 296, 38 Am. Rep. 583, and Lake Shore & M. S. R. Co. v. Spengler, 44 Ohio St. 471, 58 Am. Rep. 833, 8 N. E. 467."

I find nothing in this contract of insurance which bans it as one contrary to public policy.

For the reasons stated, I think the judgment should be affirmed.