63 So.2d 916 (1953)
CITY OF MIAMI et al.
v.
BENSON et al.
Supreme Court of Florida, en Banc.
March 24, 1953.
*917 John E. Cicero, City Atty., J.W. Watson, Jr., Sp. Bond Counsel, Robert M. Haverfield, Asst. City. Atty., Miami, and Turner, Hendrick & Fascell, Coral Gables, for petitioners.
Sibley & Davis, Miami Beach, for respondent.
MATHEWS, Justice.
The petitioners, the City of Miami, a municipal corporation and the City Commissioners, et al., have filed a petition for a writ of certiorari to review an interlocutory order made by the Chancellor in this case wherein the respondent filed a bill of complaint for himself and all other taxpayers similarly situated, seeking an injunction enjoining the City Commission and the City of Miami from disposing of twenty-seven million dollars of municipal bonds on the ground that the sale was against public policy and, therefore, void.
A contractor for the construction of a sewerage plant was allowed to intervene in the cause because of his interest in constructing the plant should the bonds be sold. The contractor and the other defendants filed a motion to dismiss the bill of complaint, which motions were denied by the Chancellor. Petition for certiorari was filed seeking a review of this interlocutory order denying the motions to dismiss.
The authority to issue the bonds in question and the validity of such bonds are not in question. They were duly authorized, voted upon by the freeholders as required by law, and all steps in connection therewith were validated by proper decree of the Circuit Court which was affirmed by this Court.
The primary question for our determination is: Is the contract for sale against public policy and, therefore, void?
On March 11, 1952, the City Commission entered into a contract with The First Boston Corporation by which the said corporation was employed to act as advisor to and to assist the City Commission relating to the sewage bonds. As a preamble to the contract it is shown that The First Boston Corporation was a firm of "high standing and experience in municipal finance" *918 and "can render a valuable service in assisting the City to consummate its present sewage program." The essential parts of the contract may be summarized as follows:
"(1) That the City of Miami employ the First Boston Corporation to act as the City's fiscal agent and advisor on all matters pertinent to the bond issue program;
"(2) That First Boston Corporation prepare an offering prospectus on the proposed bond issue;
"(3) That First Boston Corporation from a nation-wide account to underwrite the proposed bond issue for sale to the public;
"(4) That First Boston Corporation popularize the issue in advance with prospective bond buyers;
"(5) That First Boston Corporation inform the various statistical services of details concerning the proposed financing; supply the City with information on market conditions; and advise the City as to the timing of the offering of the bonds;
"(6) That the City keep First Boston Corporation fully informed on all matters relating to the bond issue program;
"(7) That, when financing details have been arranged, the City negotiate with First Boston Corporation in the first instance for the sale of the bonds;
"(8) That if bonds are purchased by First Boston Corporation, there is to be no charge for the services outlined in paragraphs (1) to (5) above;
"(9) That if bonds are sold to anyone other than First Boston Corporation, the latter is to receive for the said services payment of $2.00 per bond on the principal amount of bonds sold, plus out-of-pocket expenses not to exceed $5,000.00;
"(10) That in the event financing does not take place, the City is to reimburse First Boston Corporation for out-of-pocket expenses not to exceed $1,500.00;
"(11) That the contract is to remain in effect through two years from March 11, 1952, unless extended by mutual consent."
The bill of complaint alleged that the First Boston Corporation was employed because of its high standing and superior knowledge with reference to municipal financing to act as the City's confidential advisor to render valuable services as the agent of the City, and by reason of the contract, it was obligated to advise and assist the City on all pertinent matters relating to the sewage disposal program and to prepare an offering prospectus, setting forth information relating to the bond issue.
The bill of complaint further alleged that from August 16, 1952 until the 23rd day of January, 1953 no official communication was received by the City or the City Commissioners from the First Boston Corporation relative to the sale and disposition of the bonds or with reference to the interest rate to be paid upon the bonds; that at a regular meeting of the City Commission, on February 4, 1953, the City Manager reported to the Commission that he had received a note from the Vice-President of the First Boston Corporation that he (the Vice-President) would like to appear before the Commission to make a report as to progress. Later in the day the Commission heard a report from the Vice-President in which he explained the things which had been done for the City to get the best interest cost they could. At this meeting he advised the Commission that he desired they have a confidential meeting so that what he said would not be "broadcast all over the country." At this meeting he stated that he would have a proposal with reference to the bonds and interest rate for immediate acceptance, and that his report and advice should be in the confidential meeting. On February 5, 1953 the Vice-President of the corporation appeared before the Commission and advised that they had tried to get the lowest possible interest rate for the City "as agent for the City." He told the Commission that it had employed his corporation to advise and assist the City in financial matters *919 and that the corporation had tied up and associated with it in the proposed purchase of the bonds, all of the big outstanding competitive bond houses in the country. He, thereupon, submitted his proposal. The Vice-President explained to the Commission in detail and that they had juggled the figures "because, frankly, we were trying to confuse people so they couldn't figure out what interest rate we used." It was alleged in the bill of complaint that this juggling of figures admittedly to confuse other bond-buying houses prevented the City of Miami from having any knowledge of the interest rate they would be called upon to pay on the bonds, and that this confusion was for the purpose of not permitting it to appear what profit on the re-sale of these bonds would be made by the corporation which was the agent of the City.
The proposal submitted by the First Boston Corporation was that it would buy the bonds from the City at a private sale for a negotiated price and a negotiated interest rate. The City Commission by a vote of 3 to 2 contracted to sell these bonds to its advisor employee and agent The First Boston Corporation. The suit was brought to enjoin the consummation of the sale.
Among the grounds upon which the motion to dismiss was based were: the complaint is without equity; that should relief be granted, greater injury would accrue to the defendants than to the plaintiff and all others similarly situated; that plaintiff is guilty of laches; and that no fraud, corruption or bad faith had been alleged.
We may eliminate at the outset any question of bad faith, fraud or corruption. There is nothing in this record of fraud, bad faith or corruption on the part of the city officials or on the part of The First Boston Corporation. It is assumed that they are men of honesty and integrity and that their intentions were good. The First Boston Corporation has a high standing in the financial world for fair dealing and a superior knowledge of municipal financing gained over an experience of a long period of years.
The question here is not whether the contracts in question were entered into in bad faith, or corruptly, or for the purpose of perpetrating a fraud upon the taxpayers, but rather  are the contracts against public policy and, therefore, void?
In the case of Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Kinney, 95 Ohio St. 64, 115 N.E. 505, 506, 507, L.R.A. 1917D, 641, Ann.Cas. 1918B, 286, it was said:
"* * * When a contract is contrary to some provision of the Constitution, we say it is prohibited by the Constitution, not by public policy. When a contract is contrary to a statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone  the foundation  of all Constitutions, statutes, and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first."
In this case there can be no question that the City Commissioners, in their official capacity, were the trustees for all of the taxpayers and citizens of Miami; that they employed the First Boston Corporation as their agent or employee to assist and advise them concerning the prospectus for this bond issue and to assist them in obtaining the highest price for the bonds with the lowest interest rate; that the City Commission, under special charter authority, had the right and power to sell the bonds at private sale; that there was no special statutory authority for the City Commission to sell such bonds to their agent, advisor or employee, and if the agent entered into negotiations to purchase the said bonds from the City, then the agent, advisor and employee, as the representative of the City, would be under a *920 duty and obligation to sell the bonds at the highest practical price and lowest practical interest rate, and representing itself and being in the business for profit, its motive would naturally be to sell the bonds at the lowest practical price and at the highest interest rate.
A contract which would bind the City to sell its bonds to its agent, advisor and employee is contrary to public policy and the proposal by the agent, advisor and employee to buy such bonds and the acceptance thereof by the City Commission and the agreement to deliver the said bonds and consummate the sale were all contrary to public policy and, therefore, void.
In the case of City of Leesburg v. Ware, 113 Fla. 760, 153 So. 87, 90, in an opinion by the late Mr. Justice Ellis, the law with reference to public policy in this state was clearly stated. After having stated the law, we find the following in the opinion:
"The foregoing statement, in so far as it sets forth the principles of law applicable to a case like this, are agreed to by the entire court."
The principles alluded to appear in the opinion as follows:
"Whether the transaction was per se fraudulent or against public policy and void is the next question presented by the brief. The bank through its president, Ware, sold the Palmetto bonds to the trustees through its secretary, Ware, the same person. Mr. Ware acted in two capacities, as agent for the bank and as agent for the trustees of whom he was one. How could he serve the interests of both principals? If as president of the bank he had any information that led him to believe that the Palmetto bonds were precarious securities, or that owing to economic conditions and resultant reduction in the revenue collecting capacity of the town of Palmetto that would impair the market value of its bonds, or that rendered likely or even slightly probable a default in the payment of interest or principal, he was in duty bound to the city of Leesburg to avoid the purchase, at least impart the information to his cotrustees or to the city government, his employer, whether the ordinance required its approval or not. If, on the other hand, he knew the bonds to be perfectly sound securities but doubted the safety of the bank of which he was president as a safe place for keeping on deposit of the city's moneys, his obligation was equally strong to impart the information to his cotrustees and discuss the situation with his colleagues of the bank.
"It is difficult for any man to serve two masters. Matthew said: `No man can serve two masters; for either he will hate the one and love the other; or else he will hold to one and despise the other.' That is a fundamental doctrine which the experience of many generations of men has woven into the fabric of their municipal law. It permeates the judiciary like a vein of vitalizing force. No man can be judge in his own cause, is a mere variation of the principle.
"The doctrine may be scoffed at by self-conceited people swept off their faet by a little brief authority, or secure in the self-sufficient opinion of their own rectitude, but to countenance the practice as meeting the approval of the law would be to open the way to a saturnalia of fiscal debaucheries and invite the venal corruptionist into the home of decent business. * * *
"It may be safely stated, as a sound or accurate standard by which to determine the applicability of the rule, that no phase of private relations shall be contrary to public policy; that when a contract contravenes an established interest of society it is void as against public policy, and for one person to undertake to be the agent for two persons trading at arm's length with one another contravenes an established interest of society.
"Regardless of the element of profit or loss to the bank, the transaction was *921 void as against public policy and per se a legal fraud."
It is stated that the bill of complaint does not allege that any specific statute was violated by reason of these contracts. As heretofore pointed out, a specific statute declaring what is the public policy of the state is not necessary. "Public policy is the cornerstone  the foundation  of all Constitutions, statutes, and judicial decisions; * * *." Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Kinney, supra.
The bill of complaint alleges in no uncertain terms the relationship and interest of the parties in this case and that the contracts in question are contrary to public policy. A statute is merely declaratory of the public policy. The author of the article on Public Policy, 63 C.J.S., Municipal Corporations, § 1258, page 988, states that at the common law contracts in which officers or employees of a city have a personal interest are void and statutes are merely declaratory of the common law. Section 839.07 F.S., F.S.A., declares it to be unlawful for any officer of the state or county or incorporated town or city to be in any wise interested in a contract "for the performance of any other public work in which the said officer was a party". This Court has frequently held that the word "officer" in this connection includes employees, advisors, and agents of the officers. Bond trustees were not officers but they are included within the prohibition of the statute. City of Leesburg v. Ware, supra; Charlotte County v. Chadwick, 102 Fla. 163, 135 So. 502.
In addition to the general statute above mentioned, the charter of the City of Miami, Section 4(c) specifically provides:
"City commissioners and other officers and employees * * * shall not be interested in the profits or emoluments of any contract, job, work or service for the municipality." (Emphasis supplied.)
It is urged by the petitioners that if relief is granted, greater injury would accrue to the city than to the respondents and all others similarly situated. This is the equivalent of saying that a good purpose is to be served and, therefore, the law or the public policy of the state should be ignored, and the contracts violating the public policy of the state and the law should be condoned or approved. This is a dangerous doctrine. The establishment of such a doctrine would not simply affect this particular contract but it would open wide the door for the officers of every municipality, county, political sub-division or state board or commission to ignore the public policy and the law because they were free of fraud, bad faith or corruption and the end sought to be attained would serve a useful purpose. Public policy affects every citizen and taxpayer. The number to be benefitted is not the test in determining public policy.
The cases cited by petitioners relating to who will suffer the greatest injury and inconvenience have no bearing upon the question involved in this case. For example: in the case of City of Lakeland v. State ex rel. Harris, 143 Fla. 761, 197 So. 470, an injunction to abate a public nuisance was involved. The City was attempting to construct and maintain an efficient sewage disposal plant. This Court held that the City should be given sufficient time to improve the plant so as to overcome the deleterious condition complained about, without prejudice to the parties injured to maintain suits to enforce the payment of damages. No question of public policy was involved.
In the case of Gibson v. City of Tampa, 114 Fla. 619, 154 So. 842, the question there considered was foreign to the issues presented in this case. An owner of an oyster bed sought an injunction against the City from discharging untreated sewage in the waters of the Bay around Tampa. His suit was brought because of the damage to him in the alleged destruction of his oyster bed. No question of public policy was involved and the Court properly held that the owner of the oyster bed had an adequate remedy at law for damages.
Because it may be expedient or serve a good purpose in one case, does not justify a plain violation of the law or the public policy of this state.
*922 It is next urged by the petitioners that the respondent (plaintiff) has been guilty of laches, because the bill of complaint shows that the original contract employing the First Boston Corporation as the agent, employee or advisor of the City was dated March 11, 1952, and that the respondent (plaintiff) and all others similarly situated could have expected the action which later took place in February of 1953. There is no merit in this contention. The real danger and threat to the taxpayers did not come into being until the overt acts of February, 1953, which have been heretofore set forth, when it became known to the public that the city's agent, employee or advisor was actually making a proposal to buy the bonds at a price established and with a rate of interest fixed by it, and that the City Commission had taken action to accept such proposal and deliver the bonds to its agent, employee, or advisor.
The proposal and acceptance to buy and sell the bonds took place on February 5, 1953, and the bill of complaint was filed on February 23, 1953. The sale has not been consummated. After consummation by accepting the money and delivery of the negotiable bonds, a suit would be too late. It appears that the taxpayer moved with dispatch and speed and was not guilty of laches. 52 Am.Jur., p. 16, Sec. 23.
It is argued that the contract of employment in question is "pursuant to legislative authority," and that "the statute and validating decree authorize the sale at private sale." (Emphasis supplied.) It is true that the City had the authority to employ financial experts as its advisor, agent or employee with reference to the best interests of the City. It is also true that the statute authorized a private sale, but it did not even attempt to authorize such sale to an officer, employee, advisor or agent of the City.
We are not called upon to pass upon the wisdom or legality of a public policy fixed by the Legislature which authorizes a private sale. We are only called upon to pass upon the legality of a private sale to an advisor, employee or agent, when such advisor, employee or agent has an interest in the contract limited to $54,000 if a sale is made to someone else, and with the "sky the limit" if sold to it. The fact that a private sale is authorized by the statute does not expressly or impliedly, directly or indirectly, abrogate, change, modify, repeal or amend the law or public policy of this state, which is based upon the Biblical injunction: "No man can serve two masters".
In the case of Town of Boca Raton v. Raulerson, 108 Fla. 376, 146 So. 576, 577, this Court, in an opinion by Mr. Justice Thomas, stated the rule with reference to public policy and it is particularly applicable in this case. The Court said:
"* * * We subscribe [to] that principle of law, and conclude that, if a sale is made in violation of section 7470, Compiled General Laws of Florida 1927, the same is void, and the town may recover the full amount paid. This rule may, at a glance, seem a harsh one, because under it the town would be allowed to keep what it needs and uses and escape payment therefor, but the statute is upon the books for all to read and heed. It is a warning to those who become public officers that they may not take advantage of their position by dealing with themselves, and, being so warned, they enter upon such transactions at their peril. Should we apply in such instances the rule that recovery should be limited to the profit enjoyed from the transgression, it would open the way and extend the invitation to fraud as well as violation of the law. Men inclined to such practices, which have been condemned generally by the courts, would risk violation of the statute knowing that, if detected, they would lose none of the original investment, while, if not discovered, they would reap a profit for their perfidy. They would reason that they had much to gain but naught to lose. The adoption of the rule does not necessarily mean that such vendor may not recover the property conveyed under proper proceedings and proof where the property is intact in the vendee."
*923 In the case of City of Stuart v. Green, 156 Fla. 551, 23 So.2d 831, 834, in an opinion by Mr. Justice Thomas, this Court reaffirmed the doctrine of Town of Boca Raton v. Raulerson, supra, and said:
"* * * It was there decided pointblank that sale to the city of property owned by a city commissioner was denounced by Section 7470, C.G.L., supra, and was void."
Having reached the conclusion which we have, it is unnecessary to discuss any other questions. The contract in question, that is, the acceptance by the City of the proposal made by its agent, employee or advisor, to purchase the bonds, is contrary to public policy and is, therefore, void. Life cannot be breathed into a void contract because the completion of the void contract would render a useful purpose in accomplishing desired ends or because it is expedient.
The petition for writ of certiorari be and the same is hereby denied.
ROBERTS, C.J., and THOMAS and SEBRING, JJ., concur.
DREW, J., concurs in conclusion.
TERRELL, J., dissents.
HOBSON, J., not participating.
TERRELL, Justice (dissenting).
As I understand it, the gist of appellees' contention is that the corporation with whom the City contracted is the confidential agent of the City and that to permit it to participate in the purchase of the bonds by its very nature breeds fraud, collusion and bad faith. Any contract for sale of the bonds under such circumstances, it is contended, is void for public policy, as would be any act, covenant, or obligation made by the City in pursuance thereof.
I do not think there is any merit to this contention. In the first place, the corporation was the hired agent of the City to furnish it information that would enable it to handle the bond issue as intelligently as possible. True it had a right to negotiate for purchase of the bonds, but on the same footing that any other bond purchaser had. It had no power to bind the City or the City to bind it. Large bond issues are frequently marketed on the basis of information so secured. The power of the City to make the contract is not challenged.
The whole theory of plaintiffs' case is predicated on dual agency, potential violation of trust or what sinister purpose could be accomplished under the contract, despite the fact that there is no showing of undue or improper influence, and there is positive showing that every step taken by the City looking to the issue, validation, sale, and contract for disposition of the proceeds of the bonds, have been done as the statute and constitution contemplate. The statute in terms authorized a private sale and so far as this record discloses, the City has exercised every step in administering the responsibility imposed on it, to the best advantage of the people and in perfect good faith. Only one taxpayer in half a million people has voiced any objection to what has been done.
Under such a showing, I decline to administer a black eye to the Commissioners' effort on nothing more than a hunch, gossip, or suspicion of what they could do if they set out with an evil purpose. Court adjudications should proceed on reason when there is as much to support it as there is in this case and there is nothing but speculation to support a contrary conclusion. I therefore dissent.