**THE INTERNATIONAL ASSOCIATION OF MACHINISTS, et al., v. STATE OF FLORIDA, ex rel J. TOM WATSON as Attorney General of said State.**

15 So. (2nd) 485
November 10, 1943

June Term, 1943
En Banc

*Joseph A. Padway* and *Herbert S. Thatcher* (Washington, D. C.) and *Raymond Sheldon,* for appellants.

J. Tom Watson, Attorney General, Lawrence A. Truett, and Fred M. Burns, Assistant Attorneys General, and John W. Donahoo, for appellee.

PER CURIAM:

The Attorney General of the State of Florida instituted quo warranto proceedings against Tampa Shipbuilding Company, Incorporated, a Florida corporation, to prevent the corporation from continuing the operation of its business in Hillsborough County under an existing collective bargaining agreement theretofore entered into with certain labor unions.

The substance of the information filed by the Attorney General is that Tampa Shipbuilding Company was incorporated and qualified as a Florida corporation on November 7, 1940. The shipbuilding plant and shops of the corporation furnish substantially all of the available employment for boilermakers, iron shipbuilders, welders, ship carpenters, blacksmiths and drop forgers; and the major part of the

available employment for electrical workers, machinists, operating engineers, plumbers and steam fitters, sheet metal workers, technical engineers, architects, draftsmen and pattern makers for shipbuilding, within Hillsborough County. By its acceptance of articles of incorporation from the State of Florida Tampa Shipbuilding Company consented and agreed with the State, and with the people thereof, to refrain from entering into any contract or undertaking that was in violation of the Constitution or laws of the State of Florida, or that was ultra vires or contrary to the public policy of the State. Notwithstanding this agreement, the corporation, on July 16, 1941, entered into an unlawful contract with certain labor unions in Hillsborough County to employ only union labor in its shipbuilding operations, thereby illegally conspiring with said unions to prevent qualified persons from obtaining employment in the shipbuilding industry in Hillsborough County, unless as a condition of employment such persons were, or became and remained, members in good standing of the particular unions which represented the crafts in which they were skilled. As a result of this agreement numerous citizens and residents of Hillsborough County, and the territory adjacent thereto, who are duly qualified by experience and training, have been refused employment in the plants and shops of the Tampa Shipbuilding Company because they were not members of a union; or, if employed, have been laid off because they did not become or remain members of a union.

The charge is that such a contract creates an unlawful combination with the unions and monopoly in restraint of the equal right to work; that it is beyond the authority of the corporation to enter into such contract because the same is contrary to public policy, and is in violation of the laws and Constitution of the State of Florida.

The prayer is that Tampa Shipbuilding Company show cause by what warrant of authority it claims the right to make said contract and do business thereunder; that it be declared that the corporation is unlawfully usurping its corporate privileges by continuing said contract; and that the corporation be ousted from the continuation thereof.

In its answer Tampa Shipbuilding Company alleges that it is engaged in the construction of ships and vessels for the Navy Department of the United States Government. It admits that the major portion of the shipbuilding business in Hillsborough County is carried on in its plants and shops, although other plants are being operated in the county for the construction of ships. It admits that it entered into the collective bargaining contract with the unions as alleged and that it is operating thereunder. It admits that the effect of the contract is to favor employees who are union members, but that said contract was entered into only after there had been a conference held in New Orleans, Louisiana (known as the Gulf Zone Stabilization Conference) at which representatives of the shipbuilding industry in the zone affected, representatives of labor unions and representatives of the War Production Board, the United States Navy and the United States Maritime Commission had argeed upon certain basic standards for wages and employment in the Gulf Zone, which standards were thereafter approved by the Secretary of Navy for application to shipyards holding Navy construction contracts.

Respondent alleges that its contract entered into with the unions embodies only the standards established by the Gulf Zone Stabilization Conference; and that if compliance with its contract with the unions has affected the citizens and residents of Hillsborough County in the manner alleged, it has been without design or intention on the part of the respondent that such results should flow from its participation in the contract so approved by the Navy Department of the United States Government.

By stipulation of the parties the unions who were parties to the labor agreement with Tampa Shipbuilding Company were allowed to intervene as respondents. In due course they filed their answer alleging, among other things, the results of the "Gulf Zone Stabilization Conference," alluded to in the answer of the shipbuilding company and that its contract with the Shipbuilding Company is in conformance with basic standards for wages and employment there agreed upon and subsequently approved by the Federal Government.

Thereafter, testimony was taken on the issues presented by the information and answers thereto. At final hearing the trial court entered its judgment finding that the "closed shop" feature of the contract ". . . has become ultra vires and *invalid by virtue of present war conditions . . .*"; and that the respondent, Tampa Shipbuilding Company, and the intervening unions, shall "forthwith cancel the clause in said contract complained of . . . and desist from further executing and performing the same." (Italics supplied by us).

We think that the primary question involved in this appeal is whether, at the instance of the Attorney General of Florida, the shipbuilding company, which is engaged in building vessels exclusively for the Navy Department in times of war and under Goverment contract, may be required to desist from adhering to a "closed shop" contract, the conditions of which have been formulated by the Federal Government; neither the Federal Government, the shipbuilding company nor the unions involved being here complaining.

We are dealing in this case with two parties sui juris who have entered into a contract under the conditions above set forth, which both parties were competent to make and execute, and which the circuit judge has properly adjudged to have been lawful and valid at the time it was made; but a clause and condition of which he has held to be unenforceable because our country is now at war.

Neither the shipbuilding company nor the unions, who are the parties to the labor agreement, nor the Government, is complaining that such agreement is invalid or that the contracts for building ships are not being prosecuted and completed on schedule. The Attorney General of the State is the sole moving party, presumably on the hypothesis that an appreciable portion of the citizenry of the State is affected by the provisions for the employment of union labor exclusively—a situation not supported by the record because the complaints of fewer than a score of workmen were recounted. Has the Attorney General authority to prosecute this action? If so, has he made such showing on the record as will authorize the entry of a final judgment or order striking down the contract?

If the Attorney General may prosecute this action, it must be on the ground that by the operation of the contract between the parties the public policy of the State is being violated. The question of public policy has been ably discussed by this Court in A. C. L. RR. Co. v. Beazley, 54 Fla. 311, 45 So. 761. See also City of Leesburg v. Ware, et al., 113 Fla. 760, 153 So. 87. The question of whether the court should interfere with controversies of this character as a matter of public policy was referred to in Jetton-Dekle Lumber Company v. Mather, et al., 53 Fla. 969, 43 So. 590, where we said:

". . . moreover, may it not be judicial to add that as the questions trench so close upon the political, they may finally be solved only by the political departments of the government?"

Whether or not the provisions of a contract involving the manufacture of materials to be used exclusively in the prosecution of the war are helpful or harmful to the prosecution of that effort, is a subject over which neither State officials nor State courts have any inherent jurisdiction; and, as there exists no statute, either State or Federal, vesting such jurisdiction there, the power to determine such matters must lie where Congress, acting under the Federal Constitution, has placed it—in the Federal Government. The Constitution of the United States vests in the President and in the Congress *full* power to declare and wage war. This vesture of power carries with it all those implied powers necessary to fully effectuate this express enumerated power. McCulloch v. Maryland, 4 W. 316. The Federal power to wage war being absolute, it must necessarily be exclusive. See Ex parte Milligan, 4 Wall. 2.

This express grant of power, says the Supreme Court of the United States, in Gordon Kiyoshi Hirabayashi v. The United Statee of America, (October Term, 1942, dated June 21, 1943):

"—extends to every matter and activity so related to war as substantially to affect the conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every

phase of the national defense, including the protection from injury and from the dangers which attend the risk, prosecution and progress of war. 11 Wall 268, 303-314; Stewart v. Kahn, 1 Wall. 493, 506-7; Selective Draft Law Cases, 245 U. S. 366; McKinley v. United States, 249 U. S. 397; United States v. McIntosh, 283 U. S. 605, 622-623."

The National War Labor Board was created by executive order January 12, 1942, for the purpose of procuring an uninterrupted prosecution of the war on the part of labor and industry. This Board was given the duty of disposing of all labor disputes which might affect the war effort. In consideration of labor agreeing to a policy of no strikes for the duration of the war, labor was given the right of collective bargaining, and the National War Labor Board was set up to settle all disputes peacefully. Now if the Executive Department of each of the several States, through its Attoney General, is allowed to question in the courts of the several states whether as a matter of public policy the war effort is being properly prosecuted, then a clash is inevitable among state tribunals and between them and Federal agencies expressly created for that purpose.

It is next contended that the challenged clause of the contract is abhorrent because it effectuates a monopoly of labor in restraint of the free right to work. Perhaps that is the indirect effect of such contract, in limited degree. But assuming that to be true and that such was its purpose, it does not follow that such contract is illegal or violative of public policy. Such monopoly is not illegal per se, nor is it contrary to any applicable statute. Public policy is not thereby violated, because Congress, by at least three statutory enactments, has affirmed the right of laborers to combine and act in the interest of the group. By the Norris-LaGuardia Act, 29 U.S.C.A. No. 101-105, Congress prohibited the use of injunction to interfere with the orderly combination and action of labor unions; by the Anti-Trust Act, of 1914, Congress deliberately exempted labor unions from application of its provisions; and by the National Labor Relations Act, 29 U.S.C.A. Sec. 151, it definitely established the right of labor organizations to combine and bargain collec-

tively for the performance of labor. This established the legality in this regard of contracts such as we are now considering here.

With the wisdom of these statutes, or with the wisdom of the public policy which they establish, we cannot be concerned. The cold fact is that Congress has ordained that except where applicable statute prohibits, labor unions may indulge in practices which may produce monopolistic results, and also may combine and through one and the same representative, bargain and contract together and collectively for the performance and execution of all the labor required by any employer to be performed and in regard to which such employer is willing to enter into such contract.

But, aside from the question of the authority in the Attorney General to maintain this action, the decree is erroneous, on at least one other ground. We find no proof in the record that compliance with the contract has resulted in a retardation of the war effort. For this alone, the decree would have to be set aside; for it was upon this ground, and this ground only, that the trial court struck down the "closed shop" clause of the contract. There is some evidence in the record that some persons have been discharged who would not have been except for the challenged. provisions of the contract. It is contended that virtually all of the labor turnover was occasioned by failure of workmen to maintain union membership. But the facts do not support the contention.

It appears that the Tampa Shipbuilding Company maintains a payroll of approximately 12,000 employees. The testimony is that the company is obliged to hire approximately 600 new workmen a month in order to maintain this employee level. The inference attempted to be drawn from this turnover is that this situation has been brought about, directly or indirectly, as the result of the closed shop agreement. However, such inference cannot be substantiated by the facts of the case. It is a matter of common knowledge—the industrial circles at least—that labor turn-over is inevitable, and is to be expected at all times in more or less degree. Many factors are responsible for this situation. A "quit," which is defined by the United States Bureau of Labor Statis-

tics as a termination of employment by the worker because of his desire to leave, may result from dissatisfaction with wages, hours or conditions of labor. Sickness, disability, old age, death, or expected call to military service, may likewise be influencing factors. A "discharge" is a termination of employment at the will of the employer, with prejudice, because of some fault on the part of the worker. Insubordination, tardiness, incompetence, slothfulness, and dishonesty are some of the more common causes of discharge. A "lay-off" is a termination of employment at the will of the employer, without prejudice to the worker. Lay-offs may be due to lack of orders, technical changes, or the failure of flow of parts or materials to the job, as needed. Whatever the causes, quits, discharges and lay-offs are classified as "Labor separations." See United States Bureau of Labor Statistics, Handbook of Labor Statistics, 1936, pp. 803-804.

Apparently, labor separations (quits, discharges, lay-offs) at the Tampa Shipbuilding Company plants and shops are approximately 5 per centum per month. Is this so much higher than the average of labor separations in the industry, generally, as to raise an inference that other than ordinary normal causes are responsible for the labor condition there?

According to the official statistics published by the United States Bureau of Labor, average total separations (quits, discharges and lay-offs) in the entire shipbuilding industry in the United States for the month of January, 1941, was 7.91%; for July, 1941, 5.63%; for September, 1941 6.15%. Even before the declaration of war, therefore, the average separation rate for the industry generally was higher than it now is at the Tampa Shipbuilding Company in times of war. At the rates revealed, and assuming a payroll of 12,000 employees, the normal labor separations in the entire industry for the month of January, 1941, would have been approximately 950; and yet, for the Tampa Shipbuilding Company, it is only 600. In July, 1941, there would have been on the average, nationally, approximately 675 separations for every 12,000 employees; and in September, 1941, there would have been 738—figures much higher than those shown for the respondent company. See Labor Turn-over in Manufacturing

Industries, United States Department of Labor, Bureau of Labor Statistics.

Complete statistics are not available for the shipbuilding industry for months subsequent to the entry of the United States of America into World War II; but from such figures as are available, it appears that the national average in the industry of *quits alone* for January, 1943, was 6.98%; for February, 1943, 5.9%; for March, 1943, 7.11%; and for April, 1943, 6.3%. Total separations for male workers in the industry for August, 1943, were 10.84%; and for female workers were 13.98%.

These are but a few of the statistics taken at random from the official compilations of the United States Bureau of Labor. But they serve to illustrate, we think, that there is nothing peculiarly significant about the labor turn-over at the Tampa Shipbuilding Company's plants and shops, for, manifestly, the separation rate there is much lower than the separation rate was and is for the industry in the nation, before and during war times.

There is evidence that some people have not been employed who might have been employed, had it not been for the challenged provisions of the contract. But there is no evidence that the thousands of efficient and reliable employees who were employed under this contract would have been available for the carrying on of the work, without the benefit of such contract. In this consideration, the contract and operations under it, must be viewed as a whole and when considered in its entirety, there is no proof that the performance of the contract has in anywise created a condition more adverse to the prosecution of the war effort than that which would have obtained had the parties not entered into the contract. Nor is there any proof that such contract has in fact retarded the war effort.

We admit that every man and woman not lawfully incarcerated or otherwise incapacitated, has the right to work and earn a livelihood. But it does not follow that all have the right to require any particular person, firm or corporation to give them employment as a matter of right of contract be-

tween the employer and employee. The right of contract has been lawfully exercised in the present case.

No purpose will be served by discussing in detail the merits or demerits of the Union closed-shop policy. Sufficient to say, that the Courts have uniformly declined to hold the Union closed-shop clause against public policy, where no controlling statute exists; but have sanctioned such contracts when freely entered into without malicious design to others. Jacobs v. Cohen, et al., 183 N. Y. 207, 76 N. E. 5; Williams, et al., v. Quill, et al., 277 N.Y. 1, 12 N. E. (2nd) 547. See also Section 157, National Labor Relations Act, guaranteeing to labor the right to organize and bargain collectively. Therefore, the parties may negotiate any contracts not contrary to law or good morals. Management is free to hire only union men if it chooses. Likewise, labor is free to work only with Union men, if it chooses. The fact that a few laborers may be denied work in the particular plant or shop, unless they join the Union, will not, of itself, vitiate such contract.

In the present case it is shown that the Tampa Shipbuilding Company does not use all labor in the area. At least one other shipyard is being operated in the county—and that upon an "open shop" basis. No claim can be made, therefore, that work at the shops and plants of the Company is the only avenue open for employment.

It must be recognized that this is a case of first impression and that it was instituted by the Attorney General in good faith and as a zealous effort to pursue what he conceived to be his duty in behalf of the citizenry of Florida. But our conclusion is that the remedy for the evil—if it be an evil— is one that must be reached elsewhere than in the State forum. We have found no authority vested in courts to write new contracts for parties sui juris, contracting in regard to a lawful subject matter. That is exactly what we should do here if we should strike down any of the material conditions of the contract agreed upon between the parties. One consideration on the part of the Unions for the contract was the promise not to strike during the progress of the war. If the agreement is interfered with by the court the result

would be to release them from that promise. Thus, would be given back to them a pressure weapon well recognized, which, if resorted to, would obviously retard the war effort.

The judgment must be reversed with directions that the information be quashed.

So ordered.

BUFORD, C. J., CHAPMAN, THOMAS, ADAMS and SEBRING, JJ., concur.

TERRELL and BROWN, JJ., dissent.

TERRELL, J., dissenting:

The pith of this controversy is the validity vel non of a closed shop agreement in a contract between Tampa Shipbuilding Company and International Association of Machinists to construct ships for the United States Navy. The court below found the closed shop agreement to be "ultra vires and invalid by virtue of present war conditions."

The majority opinion reverses the trial court on the theory that, (1) None of the parties to the contract have complained or raised any question as to the validity of the closed shop agreement, and (2) The Constitution vests in Congress and the President the power to declare war and prosecute every activity essential to its successful prosecution. Pursuant to this power, the National War Labor Board was created by executive order of the President and was clothed with power by Congress to settle all labor disputes arising out of the war effort.

I dissent from both aspects of this view. It departs from the theory on which the case was tried and certainly if the court below is to be reversed, his judgment should be tried on the theory on which it was reached. In American Federation of Labor v. Swing, 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855, it was held that it would be highly improper to dispose of it on any theory. In the second place, this is not a "labor dispute" arising out of the war effort nor does it approach any of the statutory or judicial definitions of such a dispute. It is a controversy growing out of the rights of third parties affected by the closed shop agreement that the state courts are clothed with power under the Constitution to adjudicate.

American Federation of Labor v. Swing, supra. It is utter folly to contend that some bureau in Washington has jurisdiction of such issues. Not only that, it makes of Sections one, four and twelve of our Declaration of Rights nothing more than a tinkling cymbal.

Appellants also contend that the National Labor Relations Act sanctions the closed shop agreement. I think the National Labor Relations Act leaves this matter entirely in the hands of the States to regulate. In the course of its passage through Congress both the Senate and House committee reports on the bill contain the following: "The bill does nothing to facilitate closed shop agreements or to make them legal in any state where they may be illegal." Such reports may be considered in construing congressional acts. Wright v. Vinton Mountain Trust Bank, 300 U. S. 440, 57 Sup. Ct. 556, 81 L. Ed. 736; Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 55 Sup. Ct. 174, 79 L. Ed. 383; United States v. Flores, 289 U.S. 137, 53 Sup. Ct. 580, 77 L. Ed. 1086. Many states have passed acts that are modeled on the principle of the National Labor Relations Act. I have examined many of them and while there is no unanimity of treatment of the subject none of them treat it as if it were concluded by the congressional act and no court has so held.

Adjudicating the validity of a closed shop agreement is not devoid of difficulty. It has often been approved as valid while in other cases it has been stricken down as invalid. The scope of the agreement and the potentialities of its operation are the factors that have determined its validity or invalidity. Some courts take the rather extreme view that any contract between an employer and a labor union to employ only union labor is contrary to public policy and void. Curran v. Galen, 152 N.Y. 33, 46 N.E. 297; Berry v. Donovan, 188 Mass. 353, 74 N.E. 603, 5 L.R.A. (N.S.) 899. Other courts have adopted the more liberal view that when a closed shop agreement is one that embraces an entire industry of considerable or dominant proportions in the community and that said agreement has the effect of preventing skilled or unskilled working men from securing employment except on condition that they become members of the union, it is contrary to public policy

and void. Jacobs v. Cohen, 183 N. Y. 207, 76 N.E. 5; A. R. Barnes & Co. v. Berry, et al., 156 Fed. 72; Connors v. Connolly, 86 Conn. 641; 86 Atl. 600; Wilson v. Newspaper and Mail Deliverers' Union of New York and vicinity, 123 N.J. Eq. 347, 197 Atl. 720; Polk, et al., v. Cleveland Ry. Co. 20 Ohio App. 317, 151 N.E. 808; Oakes, Organized Labor and Industrial Disputes, Section 225; Labor Disputes and Collective Bargaining by Teller, Volume 1, Section 170, citing other cases and discussing the question at length.

These decisions rest on the theory that American democracy is a moral concept hostile to any species of tyranny over the will of the individual. That the pursuit of happiness as written in the Declaration of Independence and Section One, Declaration of Rights, embodies the highest prerogative of the citizen, his right to pursue without hindrance a lawful employment in a lawful manner. The common law also recognizes as part of the boasted liberty of the citizen, the right to freely engage in such lawful business, occupation, or employment as he may choose, free from hindrance or obstruction by his fellow man, save such as may result from the exercise of equal or superior rights that affect the public generally. Brennan v. United Hatters of North America, 73 N. J. Law 729, 65 Atl. 165.

The right of trade unions to strike, to picket, to bargain collectively, and to boycott in a peaceful and lawful manner for the purpose of improving their social, economic, sanitary, and cultural life is settled in this county, but no such rights being involved in this case, discussion of them would be mere surplusage. Closed shop agreements should generally be tested by the same legal principle as other contracts. When limited to skilled laborers not so numerous as to dominate the labor economy in the community, they will be upheld, Harper, et al., v. Local Union No. 520, International Brotherhood of Electrical Workers, _____ Tex. Civ. App. 48 S.W. (2nd) 1033; they have been upheld as to many other situations, but any agreement between employers and employees affecting an industry of such proportions that it seriously affects the labor economy in the community and prevents laborers from securing employment except on con-

dition of joining the union is contrary to the very fundamentals on which free institutions repose. It shackles the laborer's freedom of action and subjects his will to the will of others. It drives his labor from the open market and imposes an undue hardship on the laborer.

Is the agreement in question within this rule? Such is the question that confronts us. In his petition for quo warranto, the Attorney General representing the people of Florida, charges that the Tampa Shipbuilding Company controls the shipbuilding business of Hillsborough County and furnishes substantially all employment for boilermakers, iron shipbuilders, welders, ship carpenters, blacksmiths, dropforgers, electric workers, machinists, operating engineers, plumbers, steamfitters, sheet metal workers, technical engineers, architects, draftsmen, and pattern makers for shipbuilding.

It is also charged that the agreement in this case has been employed in a way to prevent qualified workmen in Hillsborough County from obtaining employment, that said workmen have been unlawfully prevented from securing employment in the shipbuilding business in Hillsborough County, that they are prejudiced from securing work at all unless they join the union, that the unions exercise their power to admit workmen in an arbitrary manner and when they are admitted, they are sometimes peremptorily dismissed without cause, that the business agents of the unions are given exclusive power to name employees for the Tampa Shipbuilding Company and that such power has been so arbitrarily exercised as to dominate and control the employment of laborers in the community and to discriminate against citizens and residents who are qualified to work in the shipbuilding business and who have an equal right to work there.

Such were the issues on which the case was tried by the court on stipulation of the parties. The president of the Tampa Shipbuilding Company testified that he signed the closed shop contract for the reason that "if he had tried to have gotten rid of them, we would have gotten into a war with them. If we tried to get rid of it, we would have had a walk out." The evidence further shows that an employee

could not be switched from one job to another in the shipyard without being a member of both or all the crafts representing the above list of workmen. In other words, a painter was not permitted to drive a nail or a carpenter to use a paint brush. If a painter dropped a scantling on his toe, he had to call a carpenter to take it off. A similar rule was enforced as to reciprocity between all crafts. Every person employed had to be approved by the business agent of the appropriate union who kept his office several miles from the plant and no man could be discharged except by consent of the union. The union did not supply laborers as needed, so the Shipbuilding Company provided a training school to train them but all trainees and teachers in the training school had to become members of the union. If the union failed to furnish workmen, the Company might employ them subject to their joining the union but if the union requested that a man be fired, the Company had no alternative but to fire him. At the time the evidence was taken, the Company was employing approximately twelve thousand men and had a turnover (discharges, reemployment, and changes from one union to another) of approximately 600 per month, most of which were discharges for non payment of union dues. There is evidence of discrimination, favoritism, jockeying, and delay in the employment of laborers, that merit and experience on the part of laborers counted for nothing, that employees were not forthcoming when and in as large numbers as were needed and that delay in construction resulted.

A reasonable deduction from the evidence is that the Company signed the closed shop agreement under a species of duress, that it had no authority to hire and fire, that every man held his job at the discretion of the union, was completely under the dominance of the union, and that the union dominated the supply of labor in the shipbuilding business in Hillsborough County. The union was directed by the business manager and the individual member was powerless to make his voice heard. There was direct testimony showing that the arbitrary manner in which the union exercised its jurisdiction over the crafts, delayed applications for memberships, and that the manner in which it handled the em-

ployment situation generally delayed construction. It is also shown that haggling over questions of craft jurisdiction had a decided slow down effect on construction.

Such was the evidence on which the trial court predicated his judgment and there was not a whit of direct evidence in contradiction. Appellants rest their case on negative testimony and on the abstract proposition that the closed shop is legal, that it is not contrary to public policy, that it is not monopolistic and that the abrogation of it in this case would violate rights guaranteed by the State and Federal Constitutions. I have read every case cited and relied on but they arise out of factual situations so different from those in the case at bar that they are of little aid. None of them upholds the validity of the closed shop when it offends the liberal rule cited and supported in the forepart of this opinion. I think the evidence brings the present case clearly within that rule.

I do not imply by this that the closed shop agreement is bar per se, but when it is so cast and executed as to shackle the laborer's freedom of choice, or when it is so contrary to the spirit of fair play as to any of the parties affected that it makes them burn inside with resentment because of such unfairness, it should not be permitted to stand. It is bound to have this effect when the laborer's right to work and eat is secondary to being a member of the union and the employer is expected to furnish a plant and then keep silent until he meets pay day.

The reason urged for the closed shop is that the absence of it endangers the right of collective bargaining, that management of some rival labor organization will be standing by ready to destroy it, or the feeling that the open shop gives an unfair advantage to the non-union workman who gets a "free-ride" and bearns none of the burden of securing the advantages of union organization. There is justification for this fear but in England and Sweden where labor has risen to the most secure position that it has anywhere, the closed shop has never been a leading issue and has in fact now been written off the agenda. The experience of these countries and others shows conclusively that these evils can be over-

come by methods that square with fair treatment to employers and employees.

When "Long Tom" Jefferson, the architect of our democratic theory, infused it with the dictum, "I have sworn upon the altar of God eternal hostility against every form of tyranny over the mind of man," he gave the common man the best break he had had since Jesus saved him. He impressed him with a consciousness of his dignity and planted in his breast the very essence of democracy,—a passion for liberty. True, he did not realize the full meaning of liberty until Webster taught him to spell and McGuffey taught him to read, until Edison gave him light and Ford converted his dehorned hay burner into an automobile, but equipped with these accessories, personal liberty, economic freedom, and social justice became a reality. He was at least raised to the dignity of a king and his cabin on the frontier to the dignity of a castle. It made the spirit of fair play so dominant in him that he revolts against all forms of unfair dealing.

The prophets of the Old Testament first talked about the dignity and fredom of the common man; Jesus incorporated this doctrine into the New Dispensation; but the Constitution of the United States was man's first attempt to give it political expression and to galvanize it against assault by man or the government. But what is liberty if a man's job, his very economic existence, is eternally threatened by a labor union or some other human agency? Within the year, this Court held that the liberty of worship could not be made subject to a city tax or the arbitrary discretion of a police officer. State of Florida, ex rel. Singleton v. Woodruff, decided June 1, 1943. The courts of this country have repeatedly extended the civil rights and liberties guaranteed by the Constitution to a man's job. Slaughter House Cases, 83 U.S. 36, 21 L. Ed. 394; In re Marshall, 102 Fed. 323; Fortune v. Braswell, 139 Ga. 609, 77 S.E. 818, and many others.

We have learned through thousands of years of experience the truth of Lord Acton's aphorism that "power corrupts but absolute power corrupts absolutely." The makers of the Constitution were conscious of the corroding effects of power and limited that of the President and Congress by a system

of checks and balances that have time and again demonstrated their wisdom. The power of the Governor is similarly limited and the power of industry is likewise limited. If the power of the President, the Governor, and industry in all of its phases may be thus limited and made subservient to law, when a man's right to liberty and to labor is shielded from assault by the government and his fellow man, whence comes the power of a labor union to cut him loose from his job on Saturday night for mere failure to pay his union dues? He is not required under like penalty to pay taxes that support his government and so far as I am advised, no other institution that accepts his membership imposes any such exaction.

If this is not the rule, free enterprise, the right of every man to work for whom he pleases, to hire whom he pleases, to sell his product in the open market whether it be labor or commodity, to save and invest his earnings in any legitimate way he may elect, and take the consequences is nothing more than an empty gesture. And whether he be industrialist, banker, shoe string operator, cross roads merchant, laborer, Governor, or President, he bows to the same law. Such is the incentive that distinguishes Americanism and the American way of life from other ways of livelihood. It has given the American laboring man the highest standard of living of any laboring class on earth, and it has given the common man a standing that he enjoys no where else south of the stars.

The people of this country approve the right of the laboring man to strike, to picket, and to bargain collectively, because of their sense of fair play and because these weapons place him on a footing to deal on equal terms with management. Pittman v. Nix, et al., 152 Fla. 378, 11 So. (2nd) 791 and cases cited. I do not understand that these rights raised him above the law or that they were to be used as a club to drive an unfair bargain or to intimidate a fellow workman. I think any closed shop agreement that is constructed or executed in disregard of the elements of fair play and can lead to nothing but strife between employers and employees is unreasonable and void.

I think the agreement in question is offensive to this precept because (1) It is shown that Tampa Shipbuilding

Company employs 12,000 men, that it is required by the unions to fire approximately 600 each month, not for inefficiency or other causes but for the sole reason of non-payment of union dues, and that the place of many of those fired is taken by inexperienced men. (2) That in selecting its employees, the Tampa Shipbuilding Company has no more voice than the man in the moon. (3) That when it approved the closed shop agreement, it had contracts amounting to six million dollars that were pressing and signed it to prevent a walk out. (4) The foregoing, added to constant disputes affecting craft jurisdiction, had a decided slow down effect on construction, and (5) The Tampa Shipbuilding Company was an industry of such proportions that it seriously affected the labor economy in the community, that laborers had to join the union before they could secure work with the Company, and were then arbitrarily thrown out if they failed to pay dues. Integrity and efficiency counted for nothing.

I can think of no more acute tyranny over the mind of a man than that of eternally jeopardizing his job, and certainly there is no more effective way of whittling away the liberties granted him by the Constitution. The rules governing the conduct of democracy are just as certain as those governing baseball, and if not observed, democracy will as certainly break into anarchy or some form of autocracy as a game of baseball will break up in a row when the rules are ignored. I am for the higest standard of living for all groups consistent with honest labor and the exercise of individual initiative, but if it is to be purchased at the sacrifice of the freedom that has made us great, the price is too high. If a man can be required, without his consent, to pay tribute to the union with the product of his week's labor before he breaks bread with his family, then we sanction the very thing we are fighting the Nazis for enforcing.

It is idle to contend that the validity of such a contract cannot be raised in behalf of men and women in a democracy who are being called upon to buy billions in war bonds, to dispatch their sons to the four corners of the globe to settle the question of who shall cut the pattern of human relations for the future. Shall it be cut by a ring of despots who deny

the sovereignty of man or God, whose unbridled will is law, who recognize no liberty but brute force, who have an utter contempt for human rights, who are obsessed with the idea that the common man should be their menials, and are all hell-bent on conquest and pillage?  We contend that it shall be cut by men who subscribe to the sovereignty of God and the worth of the individual, who have a passion for freedom and justice, who believe that justice is the symbol of law based on reason and fair play and that it is the heritage of all men who will not abuse it.  Any other interpretation makes the law a scape goat for those who flount it instead of a shield for those who invoke it for protection.

For these reasons, I dissent and think the circuit court should be affirmed.

BROWN, J., concurs.