Ludovico LA CHINA

v.

**DANA CORPORATION — PARISH FRAME DIVISION and United Steel Workers of America Local Union No. 3733.**

Civ. A. No. 76–689.

United States District Court,
E. D. Pennsylvania.

April 20, 1977.

Louis M. Shucker, Reading, Pa., for plaintiff.

Robert T. Miller, Reading, Pa., T. Michael Poxon, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

TROUTMAN, District Judge.

### INTRODUCTION

Plaintiff, an employee of defendant, Dana Corporation (Dana) charges that Dana has discriminated against him because of national origin and breached the collective bargaining agreement existing between Dana and the defendant, United Steel Workers of America, Local Union No. 3733, (Union) of which plaintiff was and is a member. Plaintiff also charges that the defendant Union breached its duty to adequately represent the plaintiff in failing or refusing to adequately represent the plaintiff in his dispute with Dana.

The defendants jointly contend that *res judicata* applies because the plaintiff previously filed unfair labor practice charges before the National Labor Relations Board. Defendants contend that the decision or decisions of said Board was or were "on the merits" and, therefore, *res judicata*. Plaintiff contends otherwise.

Dana separately contends that it did not breach the collective bargaining agreement. The Union agrees and separately contends that it did not breach its duty to adequately represent the plaintiff in failing or refusing to process a grievance on behalf of the plaintiff.

All parties were represented by able counsel. The case was tried to completion and extensive testimony produced.

### FINDINGS OF FACT

1. Plaintiff has been employed by Dana since May 11, 1965.

2. Plaintiff has been a member of Union at all times relevant to plaintiff's complaint.

3. Plaintiff was placed on layoff status on January 12, 1972, pursuant to notification by Dana.

4. On January 28, 1972, plaintiff was injured in an automobile accident.

5. On January 28, 1972, plaintiff received a telegram from Dana notifying plaintiff that he was to return to work in Department Number 34, second shift, as a helper on January 31, 1972.

6. Because of his automobile accident and injuries sustained as a result thereof, plaintiff notified Dana that he would not be able to report to work as requested in the above-mentioned recall notice.

7. Plaintiff was released by his attending physician to return to work on September 11, 1972.

8. Plaintiff appeared on September 10, 1972 at Dana's plant with the required Form 740, executed by Dana's company physician, indicating plaintiff had recovered from his injuries and was able to and available for return to work.

9. Due to a business decline, plaintiff was notified, upon presenting Form 740 to the personnel office of Dana, that he was once again being placed on a layoff status.

10. While on layoff status, plaintiff was involved in a second automobile accident on or about October 6, 1972, as a result of which plaintiff received additional bodily injuries. Plaintiff reported the fact of the accident and the injuries sustained as a result thereof to Dana.

11. During the course of plaintiff's layoff, commencing January 12, 1972, plaintiff

received certain supplemental unemployment benefits payable by contract between Dana and Union.

12. During the time of plaintiff's inability to work as a result of the aforementioned injuries, plaintiff, commencing January 31, 1972, also received certain supplemental sick pay benefits.

13. Plaintiff's supplemental unemployment benefits and supplemental sick pay benefits expired on October 29, 1972.

14. Supplemental employment benefits, commonly called sick sub benefits, are only available to those employees who become sick while on layoff. These benefits are provided by Dana. Dana's supplemental security plan provides additional compensation to workers in three categories. Those workers who are on layoff status and who are not sick are entitled to apply for State unemployment compensation and supplemental unemployment benefits provided from a non-contributory fund maintained by Dana. When an employee is on layoff status and becomes ill, he no longer is entitled to apply for State unemployment compensation benefits because he is unavailable for work. Consequently, he qualifies for sick sub benefits which are provided at a higher rate than the supplemental benefits in order to provide the employee with income comparable to that which he would receive from the State Unemployment Compensation Fund and from Dana's supplemental unemployment benefits program. A third-party category exists for workers who are not laid off but are injured on the job. These workers are entitled to receive workmen's compensation benefits. Blue Cross and Blue Shield benefits are available to employees and cover medical expenses incurred should they become sick either at work or while on layoff.

15. Dana maintains a procedure for return to work from layoff. If an employee is laid off and is not sick, then he is subject to recall when work is available and he may also exercise seniority rights to claim-in to a job presently held by an employee with less seniority. If an employee is laid off and sick, then he must have Form 740 completed by the treating physician, take this form to the company doctor, and obtain an approval to return to work and then report to the employment office. The employee will then be returned to the lay-off recall list and may then exercise his claim-in rights to bump a person with less seniority in another department. This procedure must be followed both upon a recall and upon an attempt to exercise the claiming procedures of the agreement.

16. Although plaintiff could have exercised his claim-in privileges in September 1972, he failed to do so.

17. Plaintiff's seniority rights as an employee of Dana during the periods material to plaintiff's complaint are governed by the collective bargaining agreement between Dana and Union, effective December 16, 1973, at Article 6.

18. A claim-in privilege entitles an employee who is permanently laid off to replace another employee in another department if he has sufficient seniority.

19. Plaintiff's claim-in privileges as an employee of Dana during the periods material to plaintiff's complaint are governed by said agreement effective December 16, 1973 at Article 6, Section 9. This agreement provides in pertinent part as follows:

"(a) When an employee is permanently laid off, he shall, under the provisions herein contained, be entitled to replace another employee in another department. Application to replace another employee must be made within five (5) working days after effective date of lay-off through an interview with the Employment Office. If an employee elects not to make an initial claim within the five (5) working days after effective date of lay-off, he may after the expiration of thirty days (30) after the effective date of lay-off make a claim at that time. If there are no jobs available at that time into which he can claim, then he has the privilege of applying at the expiration of each succeeding thirty (30) calendar days thereafter during the lay-off until such time as a job is available into which he

can claim. Management has the right to return such claimants in a reasonable manner so as not to adversely affect the operations of a new department or shift just started. The length of time he has to claim after the thirty (30) calendar days is five (5) working days. A copy of the form used for claim shall be returned by employee and a copy given to the Union."

20. Pursuant to the pertinent provisions of said agreement, plaintiff's claim-in time in January of 1972 ran for a period of five working days commencing on January 13, 1972 and expiring on January 19, 1972. Plaintiff's claim-in time for the month of September 1972 ran for a period of five (5) working days commencing on September 9, 1972 and expired on September 15, 1972. The week-end days of September 9 and 10, 1972, are not considered working days.

21. Plaintiff's claim-in period in January 1974 ran for a period of five (5) working days, commencing January 2, 1974 and expiring on January 8, 1974, not including the week-end of January 5 and 6, 1974.

22. During the last few days of November 1973, and the first week of December 1973, plaintiff was hospitalized for a period of five days for cervical neck traction. His attending physician was Dr. Cleto G. Cinelli.

23. Plaintiff visited Dr. Cinelli on December 31, 1973, and at that time received another appointment to return on January 14, 1974, for a final physical examination before discharge from treatment for the cervical sprain.

24. Plaintiff's wife visited the Union's office on January 3, 1974, for the purpose of making payments on the Blue Cross and Blue Shield group insurance that is available to Union members on layoff. At that time, the Union advised plaintiff's wife that she could pay for one week's insurance benefits because the insurance coverage expired after two years of continuous layoff.

25. Plaintiff went to the Union's office late on the afternoon of January 9, 1974, to discuss the lapse of his Blue Cross and Blue Shield insurance benefits and then spoke to Casimir J. Iwanowski, also known as "Lefty". Plaintiff told Lefty that he was having trouble with his insurance and that the company allegedly would not let him claim-in.

26. At the meeting between Lefty and plaintiff on January 9, 1975, Lefty phoned the company and made an appointment to see Eugene Troxell, at 9:00 A.M. on January 10, 1974.

27. Plaintiff did not bring a completed Form 740 with him to the Union Hall on January 9, 1974.

28. Plaintiff was wearing a neck brace when he went to the Union Hall on January 9, 1974 and spoke with Lefty.

29. Plaintiff first appeared at Dana's employment office allegedly for the purpose of claiming-in on January 10, 1974 two (2) days beyond the stated five (5) day claim-in period.

30. At the time when plaintiff appeared in said personnel office on January 10, 1974, accompanied by a Union representative, Casimir J. Iwanowski, plaintiff was wearing a neck brace.

31. At the time when plaintiff first appeared in the employment office on January 10, 1974, he did not have in his possession the requisite Form 740 executed by Dana's company physician and by his attending physician.

32. Plaintiff first appeared in the office of Dana's company physician for the purpose of obtaining said physician's approval for return to work on said Form 740 on January 11, 1974.

33. Dana's company physician, Dr. Hangen, refused to execute a Form 740 on behalf of the plaintiff because on that date, plaintiff had been on leave from his last accident for nearly 15 months and appeared in the physician's office wearing a neck brace.

34. Dana's company physician advised plaintiff that he would not execute said Form 740 on behalf of plaintiff unless he first obtained a release for work from Dr. Cleto G. Cinelli, the attending physician

who was treating plaintiff for his alleged neck injury in December of 1973 and January 1974.

35. In the course of the interview with plaintiff on January 11, 1974, Dr. Hangen, Dana's company physician, ascertained that plaintiff had been in the hospital for cervical traction from November 29, 1973 to December 5, 1973. Dr. Hangen further ascertained that the plaintiff had refused manipulation and had been discharged on December 5, 1973. Dr. Hangen phoned Dr. Cinelli and ascertained that plaintiff had a final appointment to see Dr. Cinelli at 6:15 P.M. on Monday, January 14, 1974.

36. Plaintiff obtained a release for work from Dr. Cleto G. Cinelli dated January 14, 1974, which released plaintiff to commence working on January 15, 1974.

37. Plaintiff returned to the company doctor on January 15, 1974, with the Form 740 properly completed by the attending physician, Dr. Cleto G. Cinelli. Dr. Hangen signed the Form 740 releasing plaintiff to commence work on January 15, 1974.

38. On January 16, 1974, plaintiff brought in to Dr. Hangen another Form 740 from a Dr. Eaton for "return to work" on January 8, 1974.

39. Dr. Eaton was plaintiff's family physician and was not the attending physician treating plaintiff for his neck injury in December 1973 and January 1974.

40. Dr. Hangen refused to execute the second Form 740 submitted by plaintiff and referred plaintiff to the Union representative if he needed an explanation.

41. Dana and Union agree that Dana's calculations concerning the claim-in privileges under the terms of the agreement between the Union and Dana aforementioned accurately refer to terms and intentions of both said parties to that agreement and are in accordance with past practices and procedures in interpreting and applying the agreement.

42. The Union, in a good-faith belief that said calculation of plaintiff's claim-in privileges were correct, did not process a grievance on behalf of plaintiff relating thereto.

43. Plaintiff lost his position on Dana's seniority list for the purpose of obtaining Blue Cross coverage while on layoff on January 13, 1972, upon the expiration of a two-year period from the date of initial layoff, January 12, 1974, pursuant to Article 6 of said Labor Agreement between Dana and Union. However, plaintiff's last claim-in day for purposes of exercising his seniority rights was January 8, 1974, pursuant to Article 6 of said agreement.

44. During the course of his employment from the year 1965 to the date when he allegedly attempted to claim-in during January 1974, plaintiff had numerous experiences with the proper procedure to be followed for return to work and to claim-in on a job when on layoff or sick leave, so that he knew or should have known the proper procedures required by contract and applicable company rules in January, 1974.

45. Immediately after the plaintiff left the meeting on January 10, 1974, with Eugene Troxell and Lefty, Mr. Troxell computed the plaintiff's claim-in for January 1974, and ascertained that plaintiff was out of his claim-in period. Mr. Troxell conveyed this information immediately to Lefty who was still in the building. Lefty then told John Scherer, chairman of the Grievance Committee, that plaintiff was out of his claim-in period.

46. At 11:45 A.M. January 11, 1974, Gregg H. Stark, the Divisional Industrial Relations Manager of the Reading plant of Dana, first learned of plaintiff's attempted claim-in of the preceding day when Lefty and John Scherer, the co-chairman and chairman of the Union Grievance Committee, stopped him and requested a meeting to talk about plaintiff's claim-in attempt of January 10, 1974. At 2 P.M. Mr. Stark met with Dennis Cook, Labor Relations Manager of Dana, and determined that plaintiff did not timely claim-in. Mr. Stark told Mr. Cook to contact the Union and give them his findings.

47. On January 14, 1974, Lefty phoned Mr. Troxell and made inquiries again about plaintiff's claims.

48. On January 16, 1974, John F. Scherer, president of the Grievance Committee of the Union met with Dennis F. Cook of Dana to discuss plaintiff's attempted claim-in on January 10, 1974.

49. On January 17, 1974, Mr. Cook sent John F. Scherer a letter outlining the findings of his investigation which concluded that plaintiff had failed to comply with Article 6 of the Labor Agreement and had not made a timely attempt to claim-in to a job.

50. On January 22, 1974, Mr. Scherer presented to the Grievance Committee at its weekly meeting, the issue of whether sick leave and layoff may be combined for purpose of determining the two-year claim-in period and the expiration of insurance benefits. The committee determined unanimously that plaintiff's alleged grievance was groundless and approved the motion to reject plaintiff's alleged grievance in accordance with past practices, interpretations and procedures.

51. Plaintiff contacted Lee Schaeffer, president of the Union sometime after January 11, 1974, to complain that he could not understand why his two-year period was over.

52. Mr. Schaeffer then discussed the problem with various Union personnel and people at Dana, including Gregg Stark and Eugene Troxell.

53. Mr. Schaeffer concluded that it had always been the intent of and the practice under the agreement that sickness and layoff would be combined for purposes of determining the two-year claim-in period and the two-year eligibility period for group insurance benefits.

54. As a disinterested Union official who is not a member of the Grievance Committee, Mr. Schaeffer conducted a full and adequate investigation of plaintiff's allegation that he had been to see the company doctor on January 7, 1974.

55. Mr. Schaeffer called Dr. Cinelli's office in an attempt to ascertain whether or not Dr. Hangen had indeed phoned Dr. Cinelli and if so, on what date. Dr. Cinelli's office refused to give out this information to Mr. Schaeffer.

56. Mr. Schaeffer and Warren Koller, staff representative of the United Steelworkers of America, District 7, drove out to Dr. Hangen's office to see if the dates supplied by plaintiff were correct.

57. Mr. Schaeffer called Mr. Krick, Dana's safety director, to see if he could substantiate that plaintiff was in the plant safety office.

58. Mr. Schaeffer requested plaintiff to provide any evidence at all that he had seen Dr. Hangen on January 7 or January 8, 1974, within the claim-in period. He told plaintiff to have his attorney write Dr. Cinelli and obtain the necessary verification. Warren Koller, International Staff Representative of the Union, made a similar request on March 28, 1974.

59. Plaintiff never provided the Union with any documentation that he had seen Dr. Hangen within the claim-in period or that Dr. Hangen had spoken with plaintiff's attending physician, Dr. Cinelli, within the claim-in period.

60. The Union's investigation of plaintiff's claims was thorough and complete.

61. The Union requested a review of Dr. Hangen's records and determined that such records showed no visit by plaintiff on January 7 or January 8, 1974, and showed a visit on January 11, 1974.

62. The agreement between Dana and Union authorizes the Union at Article 10, Section 1 and 2(b) to refuse an oral request of a Union member to invoke the grievance procedure. It is the intent of the agreement that if the Union determines that there is no foundation for the alleged grievance and that the grievance cannot be substantiated in any way, then it is appropriate for the Union not to invoke the grievance procedure and disrupt labor-management relations with groundless and baseless grievances.

63. Plaintiff filed two charges against the Union and one charge against Dana, with the National Labor Relations Board. The first charge filed against the Union,

Case No. 4–CB–2395, was based upon a Section 8(b)(1)(A) charge alleging in substance that the Union had failed to process plaintiff's grievance regarding his discharge. It was dismissed as untimely by the Regional Director. This decision was upheld on appeal to the office of General Counsel and a motion for reconsideration was also denied by the office of the General Counsel.

64. Plaintiff filed a second charge with the National Labor Relations Board against the Union on May 29, 1975, charging the Union with unfair labor practices within the meaning of Section 8(b)(1)(A) of the National Labor Relations Act. Plaintiff alleged that the company had incorrectly combined his period of illness and layoff in violation of Article 6 of the labor agreement and that the Union had refused to file a grievance on his behalf, pursuant to a request made on May 6, 1975.

65. The National Labor Relations Board investigated this charge, reviewed an affidavit submitted by plaintiff, and conducted discovery from the Union and Dana. The Regional Director determined that the charge lacked merit and that the Union's decision not to process plaintiff's complaint as a grievance was not arbitrary and was not a violation of Section 8 of the National Labor Relations Act. The Regional Director refused to issue a complaint.

66. On August 21, 1975, the office of General Counsel of the National Labor Relations Board denied plaintiff's appeal from said decision of Regional Director, refusing to issue a complaint. The office of General Counsel denied the appeal substantially for the reason set forth in the Regional Director's letter of June 23, 1975.

## DISCUSSION

In reaching the above findings of fact we have had to determine grave questions of credibility. We have found it impossible to accept as credible certain of the plaintiff's testimony which is contrary to the testimony of disinterested witnesses and contrary to evidence documented at the time without reference to and certainly not in anticipation of litigation. Before reaching this Court, the plaintiff failed in his attempts to obtain satisfaction before the National Labor Relations Board, the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission (EEOC). During the trial, the plaintiff appeared to have engaged in a course of conduct designed to at least mislead, if not defraud, the Court, in procuring a predated receipt from Dr. Rudolph's estate. His credibility substantially suffered by reason of the testimony of disinterested witnesses offered in rebuttal. Our findings of fact are based upon an impartial consideration of *all* the evidence of record fairly determining the credibility issues presented.

Of equal importance is the construction of the collective bargaining agreement between Dana and Union. Both parties have historically agreed upon the intention of the parties in executing the agreement—an intention and a construction reached without reference to this litigation. Both parties have agreed that, so interpreted, it has been uniformly applied to all past situations. Evidence of past practices and procedures was accepted by the NLRB and the plaintiff's complaints determined accordingly. So, here, the consistent and uniform interpretation and application of the agreement in the past weighs heavily against the plaintiff's contentions and interpretations unsupported by past practices and procedures.

In reaching our conclusions, we have carefully considered the excellent memorandum of law submitted by able counsel for the plaintiff. It must be recognized that a "layoff" initiated by the employer is ordinarily something apart and distinct from a "sick leave" initiated by the employee. *International Ass'n of Machinists v. State*, 153 Fla. 672, 15 So.2d 485 (1943). But for purposes of seniority the contracting parties may well see fit to combine the two. For this there may be various valid reasons. Long absences, from whatever cause, disrupt work schedules, interfere with the continued employment of successor employees and may well affect plant efficiency. In a competitive market both the

employer and the Union, representing its employee members, must necessarily reach and agree upon terms which will reasonably protect individual employees and at the same time reasonably protect the employees as a body, not to mention the needs of the employer in a competitive market. So here, two years was the period agreed upon by the bargaining parties. The "Employee Benefits" handbook expressly advised the Union members of the combination of lay-off and sick leave for purposes of computing the employee benefit plan. Given a similar manual as to seniority rights, it would also have provided for such combination. That no such "seniority manual" was issued does not change the proper construction and interpretation of the collective bargaining agreement and the resultant rights and liabilities of the parties.

■ Following the excellent memorandum of law submitted by able counsel for the plaintiff, we have considered the factual background in order to determine the intention of the parties. *Automobile Workers Local 937 v. Royal Typewriter Co.*, 88 F.Supp. 669 (D.Conn.1949). We have looked to the contract as a whole to resolve ambiguity as to the clause in question. We also recognize that a word or phrase shall be given its plain and clear meaning. *Clark v. Kraftco Corporation*, 510 F.2d 500 (2d Cir. 1975). We conclude that the language of the agreement, the past interpretations and applications thereof and past procedures and practices followed support the defendants' contentions.

■ Similarly, the monthly claim-in period, however arbitrary in its effect upon a given employee, is contractual and binding upon the plaintiff. It was obviously designed by the parties to create some uniformity as to when, during a particular work period involved, "claim-ins" might be expected so as to control foreseeable work schedules and to better advise working employees of possible claim-ins and resultant interruption of his or her work schedule. Plaintiff, by implication, recognizes the viability of monthly claim-in periods in contending that he did claim-in within the ap-

plicable period. Regrettably, for him, we have, by reason of medical records, documentary evidence and credible testimony to the contrary, been obliged to find that he did not claim-in as contended.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction by virtue of Section 301 of the Labor-Management Relations Act, as amended, 29 U.S.C. § 185.

2. The Court does not have jurisdiction over any allegations raised under Section 7 or Section 8 of the Labor-Management Relations Act, 29 U.S.C. § 157, § 158.

3. Plaintiff did not have a valid or legitimate grievance against Dana in reference to Dana's interpretation and application of the provisions of the labor agreement between Dana and the Union which was effective December 16, 1973, to October 31, 1977.

4. Dana did not act arbitrarily, capriciously or in bad faith, in its application of the terms and provisions of said labor agreement to plaintiff's situation, either in its calculations of plaintiff's claim-in period or in its calculation of the expiration of plaintiff's two-year layoff period by combining his layoff and sick leave in that calculation.

5. Dana did not wrongfully refuse plaintiff an opportunity to exercise claim-in privileges under Article 6 of said labor agreement to return to work in January 1974, having acted in full compliance with the terms and provisions of said labor agreement, so that Dana's actions do not constitute a violation of the Labor-Management Relations Act.

6. Plaintiff failed to establish by a fair preponderance of the evidence that he had attempted to claim-in during his claim-in period on the 2nd, 3rd, 4th, 7th and 8th of January, 1974.

7. Plaintiff did not possess a valid and legitimate grievance.

■ 8. The Union did not act arbitrarily, capriciously or in bad faith in refusing to file a grievance based on the allegations

that Dana had improperly combined sick leave and layoff for purposes of determining the two-year claim, and the unsubstantiated allegation that plaintiff had sufficiently complied with the claim-in procedures. *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

9. The Union conducted a full and fair investigation of the allegations raised by plaintiff and properly determined that the allegations were groundless and could not be substantiated.

10. The agreement between Dana and the Union gives the Union the absolute right to refuse to file groundless and unsubstantiated allegations that are contrary to the intent of the agreement and to such facts as can be determined upon investigation.

11. The Union did not act negligently, exercise poor judgment or act arbitrarily or in bad faith in refusing to file a grievance upon the allegations of plaintiff.

12. Dana did not wrongfully refuse plaintiff the opportunity to exercise his claim-in rights under Article 6 of the agreement and return to work, and was in full compliance with the terms and provisions of the agreement. Dana's acts do not constitute a violation of Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185.

13. Neither Dana nor Union exercised unlawful discrimination in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et seq.*

### CONCLUSION

We conclude: (1) that neither Dana nor Union breached the collective bargaining agreement; (2) that Union has fairly and adequately represented the plaintiff and has not breached its duty of fair representation; (3) that Union has not acted arbitrarily or in bad faith, *Bazarte v. United Transportation Union*, 429 F.2d 868 (3d Cir. 1970); (4) that plaintiff has failed to establish a violation of Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. Accordingly, judgment will be entered for the defendants and against the plaintiff.

Having thus reached the merits, we need not consider the defendants' contentions that prior proceedings before the NLRB, the EEOC and the Pennsylvania Human Relations Commission are *res judicata*.